**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TOUCHTUNES MUSIC CORP., <br><br>            Plaintiff, <br><br>     v. <br><br> ROWE INTERNATIONAL CORP., <br> ARACHNID, INC., <br> AMI ENTERTAINMENT, INC. and <br> MERIT INDUSTRIES, INC. d/b/a/ MERIT <br> ENTERTAINMENT, <br><br>            Defendants. | Civil Action No. 07-cv-11450-RWS |
| AND RELATED COUNTERCLAIMS | |

**MEMORANDUM OF LAW IN SUPPORT OF TOUCHTUNES'**
**MOTION FOR SUMMARY JUDGEMENT OF NONINFRINGEMENT**

TABLE OF CONTENTS

**Page**

I.  SUMMARY OF ARGUMENT ................................................................................1

II.  INTRODUCTION ............................................................................................1

III.  SUMMARY OF FACTS ....................................................................................3

IV.  ARGUMENT ..................................................................................................6

    A.  Summary Judgment on All Claims
        Should be Granted Without Delay ...........................................................6

    B.  Relevant Law .........................................................................................7

    C.  TouchTunes Does Not Infringe Any Claim of Any Asserted Patent.......................8

        1.  The "Studio Quality" Requirement of Each Claim.......................................8

        2.  TouchTunes' Jukeboxes Do Not
           Use Studio Quality Musical Recordings.......................................................12

V.  CONCLUSION................................................................................................15

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................8

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................................8

*Centricut, LLC v. Esab Group, Inc.*,
    390 F.3d 1361 (Fed. Cir. 2004)................................................................7

*CIAS, Inc. v. Alliance Gaming Corp.*,
    504 F.3d 1356 (Fed. Cir. 2007)...............................................8, 11, 12, 14

*Forest Labs., Inc. v. Abbott Labs.*,
    239 F.3d 1305 (Fed. Cir. 2001)................................................................7

*Jansen v. Rexall Sundown, Inc.*,
    342 F.3d 1329 (Fed.Cir. 2003)................................................................8

*Moore U.S.A., Inc. v. Standard Register Co.*,
    229 F.3d 1091 (Fed. Cir. 2000)..............................................................15

*Nike Inc. v. Wolverine World Wide, Inc.*,
    43 F.3d 644 (Fed.Cir. 1994).....................................................................7

*Phonometrics, Inc. v. N. Telecom Inc.*,
    133 F.3d 1459 (Fed. Cir. 1998)................................................................7

*Seachange Int'l, Inc. v. C-COR Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)................................................................7

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005)...........................................................7, 14


**Other**

Fed. R. Civ. P. 56(e) ..................................................................................8

1607586

TouchTunes Music Corp. ("TouchTunes") submits this memorandum in support of its Motion for Summary Judgment of Noninfringement of U.S. Patent Nos. 6,397,189 ("the '189 patent"); 6,381,575 ("the '575 patent"); 5,848,398 ("the '398 patent"); and 6,970,834 ("the '834 patent") (collectively, "the asserted patents").  Also submitted in support of the motion are the Declarations of Michael Tooker, Phil Ramone and Jonathon Reavill, as well as a separate statement of undisputed facts.[1]

## I.    SUMMARY OF ARGUMENT

During reexamination proceedings before the U.S. Patent and Trademark Office ("PTO"), Arachnid was forced to acknowledge that each of the asserted patents is limited to jukeboxes that use studio quality musical recordings.  As a result, during claim construction proceedings in this case, Arachnid has conceded that each of the asserted patents must be construed as requiring the use of studio quality musical recordings.  Thus, all claims in all asserted patents are limited to jukeboxes that use studio quality musical recordings.  It cannot be disputed that no TouchTunes jukebox (or any other TouchTunes product) uses studio quality musical recordings.  Therefore, there can be no infringement of any claim of any asserted patent, and TouchTunes is entitled to summary judgment of noninfringement.

## II.    INTRODUCTION

TouchTunes filed this declaratory judgment action seeking, *inter alia*, a judgment of noninfringement of the '189, '575, '398 and '834 patents.  The asserted patents are all directed to computer jukeboxes that, among other things, download, store and play songs.  The parties disagree as to whether the claims of the patents require various features, but they are in complete agreement on one critical issue:  All of the asserted patents require the use of a very specific type of "song."  In particular, as Arachnid has expressly advised the Court in its claim construction

---

[1] Attached as Exhibits 1, 3, 5 and 7 to the Declaration of Jonathon Reavill ("Reavill Decl.") are copies of the '189, '575, '398 and '834 patents, along with their respective Certificates of Correction.  Attached for the Court's convenience as Exhibits 2, 4, 6 and 8 to the Reavill Decl. are complete recitations of each claim of the '189, '575, '398 and '834 patents that account for the claim changes effected by the Certificates of Correction.

briefing, the parties agree that all claims of the asserted patents are limited to songs that are in the form of "studio quality musical recordings."

Before the parties reached their agreement regarding the "studio quality" requirement, Arachnid had already disclaimed coverage of non-studio quality songs at the PTO. Relying upon sworn statements, Arachnid repeatedly argued (and continues to argue) to the PTO that the asserted patents are different from the prior art, because they each require studio quality songs. Indeed, Arachnid's arguments to the PTO specifically identified the receiving, storing, accessing and playing of studio-quality audio as "critical features" not found in the prior art.

By way of its agreed claim construction and the patentability arguments it made during the reexamination proceedings, Arachnid has expressly conceded that all asserted claims are limited to jukeboxes that use studio quality musical recordings. In doing so, Arachnid has admitted that a jukebox cannot infringe any asserted claim if that jukebox does not use studio quality musical recordings.

As Arachnid has long known, no TouchTunes product uses studio quality musical recordings. Studio quality songs are "extremely large," a fact that negatively impacts the amount of space required to store the songs, as well as the amount of time required to download the songs. Declaration of Patrick Rice ("Rice Decl.") ¶ 8 (attached as Exh. 21 to Reavill Decl.). As the Declaration of Michael Tooker explains, TouchTunes recognized these drawbacks early on and consciously decided not to use studio quality songs in its jukebox system. Instead, TouchTunes elected to use songs having a format known as "MP3-128," which are far smaller in size and require much less time to download than studio quality songs. The trade-off in using MP3-128 songs, however, is that their music quality is far lower than that of studio quality songs.

The vast difference between TouchTunes' MP3-128 songs and studio quality songs is explained in the Declaration of Phil Ramone, a legend in the field of sound recording and engineering. Mr. Ramone's declaration is consistent with the sworn declaration of Arachnid's co-President, which Arachnid submitted to the PTO and which confirms that the music on

TouchTunes' jukeboxes cannot be considered studio quality musical recordings.

As a result, it is beyond reasonable dispute that TouchTunes' jukeboxes do not include the most fundamental requirement of every patent claim asserted by Arachnid – the use of studio quality musical recordings. As such, TouchTunes' declaratory judgment claims for noninfringement should be granted, and Arachnid's corresponding claims for infringement should be dismissed.

Although numerous other reasons exist as to why TouchTunes has not infringed the asserted patents, the "studio quality" issue is dispositive of all infringement claims in this case and can be ruled upon without the need for the Court to resolve any pending claim construction disputes. The fact is that every claim of every asserted patent requires a "song" in accordance with the parties' agreed definition – *i.e.*, "studio quality musical recording(s)." Thus, the absence of "studio quality musical recording(s)" from TouchTunes' products means that TouchTunes cannot infringe any claim of any asserted patent. The Court can therefore rule upon this case based on an agreed claim construction, and summary judgment should not be delayed merely because the disputed claim terms have not yet been construed.

If this motion is granted, the only remaining issues in this case will be those directed to patent invalidity, because Arachnid has not timely counterclaimed for infringement of either of the two remaining patents. Thus, upon granting of the present motion, all infringement claims will be resolved, and TouchTunes will dismiss without prejudice all of its invalidity claims as moot. The case will then be fully adjudicated and in condition for entry of final judgment.

## III.    SUMMARY OF FACTS[2]

The parties have expressly agreed that the term "song(s)" means "<u>studio quality</u> musical recording(s)."[3] This agreed definition is a requirement of each and every asserted claim. For example, every claim requires a computer jukebox, which the parties agree must play "songs" –

---

[2] A more comprehensive statement of the relevant facts is provided in the Local Rule 56.1 Statement of Material Facts in Support of TouchTunes' Motion for Summary Judgment of Noninfringement ("SMF"), submitted herewith.

[3] *See, e.g.*, SMF ¶ 2 (emphasis added); *id.* ¶¶ 1, 3, 8-9.

1607586

*i.e.*, studio quality musical recordings.[4]

In addition, each of the four asserted patents is under reexamination by the PTO. In December 2008, the PTO rejected all claims of the patents as unpatentable in view of certain prior art references.[5] In an effort to save the validity of its patents, Arachnid distinguished each asserted patent from the prior art based on the precise nature of the songs downloaded, stored and played by the claimed jukeboxes.[6] In particular, Arachnid repeatedly argued that, unlike the prior art technology, its patents required "complete songs of studio quality" and that the prior art technology could not accommodate the large amount of data contained in studio quality songs.[7] Arachnid made this same argument in each of the four reexamination proceedings, both in response to the PTO's initial claim rejections and in Arachnid's appeal after the PTO issued its final rejections.[8] Indeed, Arachnid specifically identified the receiving, storing, accessing and playing of studio-quality audio as "critical features" of its invention not found in the prior art.[9]

As Arachnid explained to the PTO (and as Mr. Phil Ramone confirms), the quality of a musical recording is objective and quantitative in nature. It does not depend upon a listener's subjective assessment of the music. Music quality depends instead upon the amount of data available in the song, per unit of time, to establish, for example, the dynamic range and clarity of the song.[10]

Thus, as Arachnid confirmed to the PTO, the quality of a song can be measured and described in terms of the song's size per minute of stereo sound (hereafter, "size-per-minute").[11] Mr. Ramone also confirms this fact.[12] A song's size-per-minute is typically designated in units

---

[4] *See, e.g.*, SMF ¶¶ 4-7, 10-12, 68, 104, 120, 136.

[5] *See, e.g.*, SMF ¶ 13, 15.

[6] *See, e.g.*, SMF ¶16; *see also* SMF ¶¶ 14, 19-22.

[7] *See, e.g.*, SMF ¶¶ 17-21, 23, 30, 31, 34, 54-55, 77-79, 105-06, 122-23.

[8] *See, e.g.*, SMF ¶¶ 17-21, 23, 30, 31, 34, 54-55, 77-79, 105-06, 122-23.

[9] *See, e.g.*, SMF ¶ 22, 48, 71, 118, 122, 130.

[10] Rice Decl. ¶ 6-8, 10, 11; Declaration of Phil Ramone ("Ramone Decl.") ¶ 8; SMF ¶¶ 49-52.

[11] Rice Decl. ¶ 10; SMF ¶¶ 153-54.

[12] Ramone Decl. ¶¶ 8-11.

- 4 -

of megabytes ("MB") and defines how much music data is available for each minute of the song.[13] The more data that is available for each minute of the song, the higher the quality of the resulting music. For example, a music file having a high size-per-minute of 10 MB has 10 megabytes of data for each minute of the song. In contrast, a music file having a low size-per-minute of 1 MB has only 1 megabyte of data for each minute of the song, resulting in much lower music quality.[14]

Of course, the more data available for each minute of the song, the larger the music file. For example, a complete three-minute song having a size-per-minute of 10 MB would require about 30 megabytes of storage space. In contrast, the same song having a size-per-minute of 1 MB would require only about 3 megabytes of storage space.[15]

There is no dispute as to what constitutes a "studio quality musical recording." "Studio quality" music has a size-per-minute of at least 10.1 MB, and can have sizes-per-minute as high as 66 MB.[16] In distinguishing the prior art, Arachnid confirmed that "studio quality" songs – and thus all asserted claims – require the songs to "take[] around 10MB per one minute of stereo sound."[17] It is also undisputed that the MP3-128 music of TouchTunes' jukeboxes has a size-per-minute of only 0.94 MB.[18] Thus, the size-per-minute of TouchTunes' MP3-128 music is less than one-tenth of the size-per-minute required to constitute a studio quality song.[19] By using music having a size-per-minute that is only one-tenth that of studio quality songs, TouchTunes' system relies on non-studio quality songs – the same prior art feature that Arachnid expressly distinguished at the PTO and excluded from the scope of its patents.[20]

Arachnid argued to the PTO that all of the asserted patents require the use of studio

---

[13] See, e.g., Ramone Decl. ¶ 9; Rice Decl. ¶ 10; SMF ¶ 155.

[14] See, e.g., Ramone Decl. ¶ 9; Rice Decl. p 10; SMF¶¶ 155-59.

[15] See, e.g., SMF ¶¶ 160-62.

[16] See, e.g., SMF ¶¶ 163-64.

[17] Rice Decl. ¶ 10; SMF ¶ 165.

[18] See, e.g., SMF ¶¶ 171, 191, 193.

[19] See, e.g., SMF ¶¶ 175, 191, 222.

[20] See, e.g., SMF ¶¶ 56-57, 60, 62-63, 82-88, 170, 226-27; Rice Decl. ¶¶ 7-8, 10, 11.

quality songs.[21]  It confirmed that limitation in its admission to this Court that all of the asserted patents should be construed to require the use of studio quality songs.[22]  Having made such consistent, clear and unmistakable disavowals as to the scope of the asserted patents, Arachnid cannot properly maintain an infringement case against TouchTunes.

TouchTunes does not use studio quality songs and therefore cannot infringe any of the patents.[23]  TouchTunes designed its jukebox system so that its jukeboxes would <u>not</u> download, store or play studio quality musical recordings.  In particular, TouchTunes decided to use songs of much lower quality, known as MP3-128 songs, in order to minimize the storage space needed to store the songs on the jukeboxes, as well as to reduce the amount of time required to transmit songs to its jukeboxes.[24]  At just 0.94 MB, the size-per-minute of the MP3-128 music is less than <u>one-tenth</u> that of the 10 MB required to constitute a studio quality song.  The small size-per-minute is a result of the MP3 compression process, which removes vast amounts of data from the original version of the song.  In the case of converting a studio quality song to the MP3-128 format, about <u>90%</u> of the data contained in the studio quality version of the song is removed.[25]  The music in TouchTunes' jukebox system simply cannot reasonably be considered studio quality musical recordings.[26]  Further, TouchTunes' jukeboxes are not even capable of playing studio quality musical recordings.[27]

## IV.   <u>ARGUMENT</u>

### A.   Summary Judgment on All Claims <u>Should be Granted Without Delay</u>

The parties have agreed that the term "song(s)" means "<u>studio quality</u> musical

---

[21] Rice Decl. ¶¶ 6-8, 10, 11; SMF ¶¶ 13-147, 228-30.

[22] *See, e.g.*, SMF ¶¶ 1-12.

[23] *See, e.g.*, Ramone Decl. ¶¶ 2, 11-15; Tooker Decl. ¶¶ 5-12; SMF ¶¶ 186-89, 217-18.

[24] *See, e.g.*, SMF ¶¶ 192-216, 220-21, 226-27.

[25] *See, e.g.*, SMF ¶¶ 221-24.

[26] *See, e.g.*, SMF ¶¶ 228-45.

[27] *See, e.g.*, SMF ¶ 190.

1607586

recording(s)." This agreed definition is a requirement of each and every asserted claim.[28] In addition, Arachnid has repeatedly confirmed the studio quality requirement in sworn statements to the PTO in its attempt to distinguish prior art in the reexamination proceedings.[29] Thus, noninfringement can be determined based on the agreed studio quality requirement of the claims, and there is no need to delay summary judgment until the claim construction proceedings are completed. *Cf. Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1464 (Fed. Cir. 1998) ("Because we can dispose of this appeal by construing only the 'call cost register means,' we need not and do not construe other, unrelated clauses…").

     **B.**    <u>**Relevant Law**</u>

     The patentee bears the burden of proving infringement by a preponderance of the evidence. *See, e.g.*, *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004). In determining whether or not infringement exists, the patent claims, as construed, must be compared to the accused device. *See, e.g.*, *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed.Cir. 1994). "A patentee claiming infringement must present proof that the accused product meets each and every claim limitation." *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001). Even if only one element is missing, there is no literal infringement. *See, e.g.*, *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1312-13 (Fed. Cir. 2005). Moreover, there can be no infringement under the doctrine of equivalents as a matter of law if the theory of equivalence would vitiate a claim limitation or attempt to recapture subject matter surrendered during prosecution. *See, e.g.*, *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372-74, 1378 (Fed. Cir. 2005).

     The question of infringement is amenable to summary judgment. *See, e.g.*, *Nike*, 43 F.3d at 646. As in any other context, summary judgment on the issue of patent infringement is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See, e.g.*, *id.* "The evidence of the nonmovant is to be

---

[28] *See, e.g.*, SMF ¶¶ 1-12.

[29] *See, generally, e.g.*, SMF ¶¶ 13-147.

believed, and all justifiable inferences are to be drawn in his favor." *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1331 (Fed.Cir. 2003). Nevertheless, in order to survive a motion for summary judgment, the non-movant must show more than a mere "theoretical possibility" or "metaphysical doubt" as to the material facts. *Id.* at 1334. Rather, the non-movant must come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see* Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Arachnid cannot satisfy its burden here.

## C.    TouchTunes Does Not Infringe Any Claim of Any Asserted Patent

### 1.    The "Studio Quality" Requirement of Each Claim

The parties agree that each claim of the asserted patents requires "studio quality musical recordings."[30] Further, Arachnid has repeatedly told the PTO during the reexamination proceedings that all of the asserted patents are limited to the use of complete studio quality songs.[31] Arachnid even identified the use of studio quality songs as a "critical" feature.[32] In view of the agreed construction and the sworn statements and related arguments it made to the PTO, Arachnid cannot assert that its patents cover jukeboxes, such as TouchTunes' jukeboxes, that do not use studio quality musical recordings. *See, e.g., CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1361-63 (Fed. Cir. 2007) (reexamination context).

In its attempt to distinguish the patents from the prior art, Arachnid consistently emphasized that the songs claimed in the asserted patents are "complete songs of studio quality."[33] Arachnid also submitted sworn statements from its co-President (Patrick Rice) defining exactly what is required for a song to constitute a studio quality musical recording in the

---

[30] *See, e.g.*, SMF ¶¶ 1-12.

[31] *See, generally, e.g.*, SMF ¶¶ 13-147.

[32] *See, e.g.*, SMF ¶¶ 39, 48, 71, 118, 122, 130.

[33] *See, e.g.*, SMF ¶¶ 14-21, 26, 30-31, 50, 54-55, 77-79, 105-06, 122-23, 143.

context of its patents.[34]   Among other things, those sworn statements described "studio quality" music as "the extremely large amount of data contained on each CD [compact disc] even for one song" and emphasized the claimed transmission, storage and playback of that data as a point of distinction over the prior art.[35]

More particularly, the Rice Declaration expressly defines "studio quality" songs as requiring a size-per-minute of at least 10 MB:

> In 1992, a complete song of studio quality would have required at least (even for a short song) about 30MB of computer storage space because a stereo CD audio converted to WAV files takes around 10MB per one minute of stereo sound. Since most songs are between three and five minutes, taking a 600MB CD, somewhere between 12 and 20 songs could be stored on a CDROM in the WAV format.

Rice Decl. ¶ 10 (emphasis added).  In each of the reexaminations, Arachnid repeatedly relied upon the Rice Declaration as a reflection of "the understanding of a person of skill in the art of coin operated machinery with respect to the components and operation of karaoke machines and jukeboxes."[36]  The statements Arachnid made in the Rice Declaration comport with the established understanding of "studio quality."  That understanding remains the same today as it was in 1992:  "Studio quality" musical recordings (and, thus, the Arachnid patents) require a size-per-minute of at least 10 MB.[37]

Arachnid repeatedly argued that its claims were patentable, because the prior art technology could not accommodate the large volume of data contained in "complete songs of studio quality."[38]  For example, in connection with the '834 patent, Arachnid distinguished music used in prior art devices by arguing that:

> A person of ordinary skill in the art would have instead understood "songs stored" in the computer jukebox of claims 1 and 10 of the '834 Patent to be song

---

[34] See, e.g., Rice Decl. ¶ 10; SMF ¶ 23.

[35] See, e.g., Rice Decl. ¶¶ 6-8, 10, 11; SMF ¶ 25.

[36] See, e.g., SMF ¶¶ 27, 66, 100, 116, 132; see also id. ¶¶ 65, 97-99, 115, 133, 140.

[37] See, e.g., Ramone Decl. ¶¶ 8-11; SMF ¶ 28; see also id. ¶¶ 50, 53, 66, 73, 75, 100, 105-07, 109, 113, 116, 122-24, 126, 128, 134.

[38] See, e.g., SMF ¶¶ 14-21, 26, 30-31, 50, 54-55, 77-79, 105-06, 122-23, 143.

1607586

> waveforms (*i.e.*, audio signals) of <u>complete songs</u> <u>of studio quality</u>. Similarly, "<u>song data</u>" (from claim 3) that is stored in "a programmable memory" of "a central management station" and stored in "a song storage location" of "a data storage unit" of "a computer jukebox," would have been understood to mean the data that constitutes digitized audio signals of <u>complete songs of studio quality</u>.

SMF ¶¶ 30, 122 (emphasis in original; emphasis added)  Prior art devices, according to Arachnid, "did not play studio-quality songs or music."[39]  (Arachnid made corresponding arguments in connection with each of the other three asserted patents.[40])

Indeed, according to Arachnid, "[h]andling (storing, transmitting, managing, etc.) large computer file sizes was a particular hurdle to overcome in 1992," and the claimed requirement for downloading, storing and playing songs having such large amounts of data was not something that would have been contemplated in the prior art.[41]  For example, in addressing all of the patents, Arachnid distinguished the prior art by arguing that:

> [I]t was not well understood in the coin-op industry that the following components (<u>which correspond to various claim elements of the various patents under reexamination</u>), for instance, could, or should, be integrated into a single computerized mechanism:
>
> - a large capacity memory for <u>storing, accessing and playing</u> studio-quality audio;
>
> - at least one communication interface for <u>receiving digitized song data</u> [*i.e.*, the data that constitutes digitized audio signals of <u>complete songs of studio quality</u>] …
>
> Integrating these components together into a single computerized device in 1992 would not have been intuitive to the average person working in the coin-operated gaming industry because, for instance, the transfer of CDs to and from jukeboxes back then was purely physical.  That is, <u>CDs themselves generally could not be efficiently transferred via modem</u>.  Rather, a person had to physically, manually insert/remove CDs into/out of jukeboxes.  <u>Shifting to a new, disruptive paradigm where the contents on those CDs – the data – would be transferred via modem and telephone lines would not have been intuitive to a person of ordinary skill in the art</u>.  Additionally, this person with ordinary skill circa 1992 would have realized that <u>based on the low bandwidth available then, and the extremely large amount of data contained on each CD even for one song, it would not have been something he or she was likely to attempt</u>.

---

[39] Rice Decl. ¶ 6; SMF ¶¶ 32, 145.

[40] *See, e.g.*, SMF ¶¶ 54-55, 177-78, 106-07, 123; Rice Decl. ¶ 6.

[41] Rice Decl. ¶ 11; *see id.* ¶¶ 6-8, 10; SMF ¶¶ 33, 145-47.

1607586

Rice Decl. ¶¶ 7, 8 (emphasis added).[42]  In each reexamination proceeding, Arachnid described the Rice Declaration as providing a discussion of the differences between the prior art and "the claimed invention of a computer jukebox."[43]  Thus, the Rice Declaration makes clear that Arachnid disclaimed any jukebox that does not download, store and play studio quality musical recordings, such as a complete song from a CD.[44]

The arguments accompanying the Rice Declaration confirm Arachnid's intent to limit the asserted patents to the use of studio quality musical recordings.[45]  For example, Arachnid continued to distinguish the prior art based on the challenges presented by the large size of studio quality songs, particularly with respect to the ability to "download large song files to a jukebox, store the song files at the jukebox, and play the songs at the jukebox, as claimed."[46]  According to Arachnid, the prior art took a different approach to those challenges:  Rather than using studio quality musical recordings, the prior art used low-quality music data "[i]n order to avoid large storage or bandwidth requirements."[47]  In view of such arguments, it is not surprising that Arachnid specifically identified the receiving, storing, accessing and playing of studio-quality audio as "critical features" not found in the prior art.[48]  *See, e.g.*, *CIAS, Inc.*, 504 F.3d at 1361-63.

In sum, Arachnid repeatedly argued that its patents were different from the prior art, because they require that complete studio quality musical recordings be downloaded to, stored at and played by the jukeboxes.  Arachnid confirmed that "a complete song of studio quality … takes around 10 MB per one minute of stereo sound."[49]  In doing so, Arachnid made clear that the claimed songs must have a size-per-minute of at least 10 MB.  That is, Arachnid expressly

---

[42] *See also* SMF ¶¶ 34, 122, 146.

[43] *See, e.g.*, SMF ¶¶ 29, 66, 100, 116, 134.

[44] *See, e.g.*, SMF ¶ 35, 139-47; *see also id.* ¶ 148.

[45] *See, e.g.*, SMF ¶ 36.

[46] *See, e.g.*, SMF ¶¶ 37, 49, 72, 113-14, 128-29.

[47] *See, e.g.*, SMF ¶¶ 56-57 (emphasis added), 62-63, 82-88, 90; *see also id.* ¶¶ 38.

[48] *See, e.g.*, SMF ¶ 22, 48, 71, 118, 122, 130.

[49] Rice Decl. ¶ 10; SMF ¶ 41.

1607586

excluded from the scope of the asserted patent claims any jukebox that does not receive, store and play songs having a size-per-minute of at least 10 MB.

Arachnid made these unambiguous arguments to the PTO in order to distinguish its patents from the prior art. In addition, Arachnid has conceded to this Court that its patents are limited to the use of "studio quality musical recordings."[50] Arachnid cannot now assert that its patents are infringed by a jukebox system in which the jukebox does not receive, store and play complete studio quality musical recordings. *See, e.g., CIAS, Inc.*, 504 F.3d at 1361-63.

### 2. TouchTunes' Jukeboxes Do Not Use Studio Quality Musical Recordings

When designing its jukebox system, TouchTunes made a conscious decision not to use studio quality musical recordings.[51] One reason for that decision is that many of TouchTunes' potential jukebox customers only had a low-speed data connection, such as dial-up connections, at the jukebox location. TouchTunes decided that studio quality songs were simply too large to be downloaded quickly to its jukeboxes over a low-speed connection. In order to avoid excluding potential customers simply because they were limited to a low-speed data connection, TouchTunes decided that it would not use any studio quality songs in its system. Further, TouchTunes sought to maximize the number of songs it could store on its jukeboxes without requiring excessively large and expensive memories.[52]

Thus, TouchTunes decided to use songs of much lower quality, known as MP3-128 songs, in order to minimize the storage space needed to store the songs on the jukeboxes, as well as to reduce the amount of time required to transmit songs to its jukeboxes.[53] Specifically, before any music can be introduced into and used in TouchTunes' jukebox system, the music must first be converted to an MP3-128 format, which has a size-per-minute of 0.94 MB.[54] The

---

[50] *See, e.g.*, SMF ¶¶ 8-12.

[51] *See, e.g.*, SMF ¶¶ 195-96; *see also* SMF ¶¶ 191-93.

[52] *See, generally, e.g.*, SMF ¶¶ 191-221.

[53] *See, e.g.*, SMF ¶¶ 200-13.

[54] *See, e.g.*, SMF ¶ 191.

size-per-minute of the resulting "MP3-128" song is less than <u>one-tenth</u> that of the 10 MB required to constitute a studio quality song.[55]  The MP3-128 song has such a small size-per-minute because the compression process removes vast amounts of data from the original version of the song.[56]  In the case of converting a studio quality song to the MP3-128 format, about <u>90%</u> of the data contained in the studio quality version of the song is removed.[57]

As Arachnid itself recognizes, the loss of data brings with it the loss of quality:

> One of ordinary skill would know that there are <u>trade-offs relating to the use of compression</u> (i.e., <u>the sacrifice of quality</u> for download speed, and vice versa), and that those trade-offs may not be acceptable to the hypothetical one of ordinary skill.

SMF ¶ 181 (emphasis added).[58]  In choosing not to use studio quality songs, TouchTunes traded the quality of its music for reduced storage requirements and faster download speeds.[59]  In this manner, TouchTunes' system is similar to the prior art that Arachnid expressly distinguished in the reexamination proceedings.  TouchTunes declined to use studio quality songs for the same reasons as the prior art distinguished by Arachnid – "[i]n order to avoid large storage or bandwidth requirements."[60]

There can be no dispute that the 0.94 MB size-per-minute of MP3-128 music is far from the 10 MB required by the claimed "studio quality musical recordings."[61]  As illustrated in the figure below, the size-per-minute of TouchTunes' MP3-128 music is about <u>90% less</u> than that required by the patents.

---

[55] *See, e.g.*, SMF ¶¶ 222.

[56] *See, e.g.*, SMF ¶¶ 223.

[57] *See, e.g.*, SMF ¶¶ 224; Ramone Decl. ¶¶ 5-6, 11, 13-14.

[58] *See also* SMF ¶¶ 167-80; Ramone Decl. ¶¶ 8-15.

[59] *See, e.g.*, SMF ¶¶ 204, 213-16, 226.

[60] *See, e.g.*, SMF ¶¶ 56-57, 62-63, 82-88, 90; *see also id.* ¶¶ 38, 148.

[61] *See, e.g.*, SMF ¶¶ 235, 237-41.



Figure 1:  Comparative Sizes-per-Minute

Simply stated, TouchTunes' jukeboxes do not download, store or play studio-quality musical recordings, and it is therefore beyond reasonable dispute that TouchTunes does not satisfy the studio quality requirement of each patent.[62]  Thus, at least one fundamental requirement of every claim of every asserted patent is missing from all of the accused TouchTunes products.[63]  As a result, there can be no literal infringement of any asserted patent by any accused product in this case.  *See, e.g.*, *V-Formation, Inc.*, 401 F.3d at 1312 ("Literal infringement requires that each and every limitation set forth in a claim appear in an accused product.").  Nor can there be any infringement under the doctrine of equivalents, because Arachnid has disclaimed coverage of any song having a size-per-minute less than 10 MB.  *See, e.g.*, *CIAS, Inc.*, 504 F.3d at 1361-63.  Moreover, any finding of equivalence would vitiate the entire "studio quality" limitation of the claims, and is therefore impermissible as a matter of law.

---

[62] *See, e.g.*, SMF ¶¶ 148, 235-48.

[63] *See, e.g.*, SMF ¶ 248.

1607586

*See, e.g.*, *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) ("to allow what is undisputedly a minority (*i.e.*, 47.8%) to be equivalent to a majority [*e.g.*, 50.001%] would vitiate the [majority] requirement").  TouchTunes' jukeboxes simply do not have the "critical features" identified by Arachnid.

## V.    CONCLUSION

For at least the foregoing reasons, there is no genuine dispute as to any material fact regarding the studio quality issue.  Thus, no factual dispute precludes summary judgment of noninfringement in favor of TouchTunes, and TouchTunes respectfully requests that the Court grant summary judgment that TouchTunes does not infringe any of the patents asserted by Arachnid.

Respectfully submitted,

Date:  March 19, 2010           By:    /s/James S. Blank
                                       James S. Blank (JB-4376)
                                       **KAYE SCHOLER LLP**
                                       425 Park Avenue
                                       New York, New York  10022-3589
                                       Tel:  (212) 836-8000
                                       Fax:  (212) 836-8689
                                       E-mail:  jblank@kayescholer.com

                                       Joseph S. Presta
                                       E-mail:  jsp@nixonvan.com
                                       Jonathon T. Reavill
                                       E-mail:  jtr@nixonvan.com
                                       **NIXON & VANDERHYE, P.C.**
                                       901 North Glebe Road, 11th Floor
                                       Arlington, Virginia  22203
                                       Tel:  (703) 816-4000
                                       Fax:  (703) 816-4100

                                       *Attorneys for Plaintiff*
                                       *TOUCHTUNES MUSIC CORP.*

1607586