```
                                    ┌──────────────────────────────┐
                                    │ USDC SDNY                    │
                                    │ DOCUMENT                     │
UNITED STATES DISTRICT COURT        │ ELECTRONICALLY FILED         │
SOUTHERN DISTRICT OF NEW YORK       │ DOC #: _____           │
                                    │ DATE FILED: 7/22/10          │
--------------------------------------X────────────────────────────┘
```

TOUCHTUNES MUSIC CORP.,

                Plaintiff,            07 Civ. 11450

     -against-                     OPINION

ROWE INTERNATIONAL CORP., ARACHNID,
INC., AMI ENTERTAINMENT, INC. and
MERIT INDUSTRIES, INC.,

                Defendants.

--------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff
        TouchTunes Music Corp.

        KAYE SCHOLER LLP
        425 Park Avenue
        New York, NY  10022-3589
        By:  James S. Blank, Esq.

        NIXON & VANDERHYE, P.C.
        901 North Gelbe Road, Suite 1100
        Artlington, VA  22203
        By:  Joseph S. Presta, Esq.
             Jonathan T. Reavill, Esq.

        Attorneys for Defendant
        Arachnid, Inc.

        MCANDREWS, HELD & MALLOY, LTD.
        500 West Madison, 34th Floor
        Chicago, IL  60661
        By:  James P. Murphy, Esq.
             Paul W. McAndrews, Esq.

**Sweet**, D.J.

Plaintiff Touchtunes Music Corporation
("Touchtunes") brings this patent infringement action
seeking a declaratory judgment of noninfringement and
invalidity of six patents owned by Defendant and
Counterclaimant Arachnid, Inc. ("Arachnid").  In its Answer
and Counterclaims, filed on February 15, 2008, Arachnid
counterclaimed that Touchtunes infringed four of these six
patents, U.S. Patent Nos. 5,848,398 (the "'398 Patent"),
6,381,575 (the "'575 Patent"), 6,397,189 (the "'189
Patent"), and 6,790,834 (the "'834 Patent").  Arachnid
added a fifth patent, U.S. Patent No. 6,191,780 (the "'780
Patent"), to its infringement counterclaims in its Amended
Answer and Counterclaims, filed on May 14, 2010, but no
claims from the '780 patent have been presented for
construction.  Currently at issue are claims 1, 2, 8, and 9
of the '398 Patent; claims 1-6, 9-11, 15, and 21-25 of the
'575 Patent; claims 1-8, 10, and 11 of the '189 Patent; and
claims 1-7, 9-15, and 17 of the '834 Patent (collectively,
the "claims-in-suit").

Pursuant to Markman v. Westview Instruments,
Inc., 517 U.S. 370 (1996), the parties submitted briefing

1

regarding their proposed construction of disputed claim terms. After conferences between the parties, a Markman hearing was held on March 23, 2010.

The Court's construction of the disputed claim terms is set forth below.

## I.   PRIOR PROCEEDINGS

On December 20, 2007, Touchtunes filed its complaint alleging that Defendants Rowe International Corp. ("Rowe"), AMI Entertainment, Inc., and Merit Industries, Inc. (collectively, the "Rowe Defendants") infringed several of Touchtunes' U.S. Patents and seeking a declaratory judgment. Touchtunes also sought a declaratory judgment of noninfringement and invalidity of six patents owned by Arachnid. On February 15, 2008, Arachnid counterclaimed that Touchtunes infringed four of these six patents and, on May 14, 2010, added a fifth patent to its counterclaims.

In or about April 2009, Touchtunes and the Rowe Defendants entered into a settlement agreement, pursuant to which Touchtunes' affirmative claims against the Rowe

2

Defendants and its declaratory judgment action against Rowe were both dismissed.

On March 19, 2010, Touchtunes filed a motion for summary judgment and oral argument was heard on May 26, 2010.  The resolution of Touchtunes' summary judgment motion remains sub judice.

On March 23, 2010, the Court held a Markman hearing to address issues of construction of certain terms of the claims-in-suit.

## II.  THE FACTS

The relevant facts are set forth in the parties' opening and responsive claim construction briefs.

The patents at issue in this case each relate to "computer jukeboxes," the latest generation of jukeboxes. Certain of these patents are directed to the display of downloaded advertisements on these computer jukeboxes, while the others are directed to the operation of the computer jukeboxes in a "user attract mode" intended to attract patrons.

3

**III. THE LEGAL FRAMEWORK AND APPLICABLE STANDARD**

Claim construction is an issue of law to be determined by the court. Markman, 517 U.S. at 385. In interpreting the meaning of claim terms, "words of a claim 'are generally given their ordinary and customary meaning'" as understood by "a person of ordinary skill in the art at the time of invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (citations omitted). The court reads a claim term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313.

The Federal Circuit has emphasized the importance of "intrinsic" evidence in claim construction: the words of the claim themselves, the written description in the patent's specification, and, when necessary, the history of the patent application's prosecution before the U.S. Patent and Trademark Office (the "PTO"). Id. at 1314-17.

4

The process of claim construction begins with the language of the claims themselves, which the patentee selected to "'particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention.'" Id. at 1311-12 (quoting 35 U.S.C. § 112, ¶ 2). Thus, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." Id. at 1314. In addition to the particular claim being examined, the context provided by other claims may be helpful as well. Id.

Claim language must also be read in the context of the specification. Id. at 1315. The specification "is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). When the patentee "act[s] as his or her own lexicographer" and includes an explicit definition of a claim term in the specification, that definition is dispositive. Id. at 1319 (citation omitted). The specification also acts as a dictionary "when it defines terms by implication." Vitronics, 90 F.3d at 1582. However, when relying on the specification to interpret

5

claim terms, a court should not be confined to the embodiments described in the specification. Phillips, 415 F.3d at 1323. The mistake of "reading a limitation from the written description into the claims" is "one of the cardinal sins of patent law." Id. at 1320 (quoting SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001)).

Courts may also utilize the prosecution history, which "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. at 1317 (citations omitted). However, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.

Finally, courts may rely on "extrinsic" evidence such as dictionaries, learned treatises, and expert testimony, which may serve as a source of "accepted meaning of terms used in various fields of science and technology" or provide "background on the technology at issue." Id. at 1317-18. However, such extrinsic evidence is "less

significant than the intrinsic record in determining the legally operative meaning of the claim language." Id. at 1317 (internal citations and quotation marks omitted). Extrinsic evidence may not be used to contradict the meaning of the claim terms as evidenced by the intrinsic evidence. Id. at 1317-19; see also Biagro W. Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1302 (Fed. Cir. 2005).

Limitations presented in the "means-plus-function" format "must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof" for performing the claimed function. Lockheed Martin Corp. v. Space Sys./Loral, Inc., 324 F.3d 1308, 1318 (Fed. Cir. 2003); see 35 U.S.C. § 112, ¶ 6.

In construing a means plus function limitation, a court must first identify the claimed function and then identify the corresponding structure disclosed in the written description that performs that function. See Applied Med. Res. Corp. v. U.S. Surgical Corp., 448 F.3d 1324, 1332 (Fed. Cir. 2006); JVW Enters., Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005). When identifying the claimed function, a court may not

construe the function "by adopting a function different
from that explicitly recited in the claim." JVW, 424 F.3d
at 1331 (internal quotations marks and citation omitted).
Once the function is properly identified, a court examines
the patent's specifications to identify the structure that
corresponds to the claimed function. See Applied Med., 448
F.3d at 1332. "Under this second step, 'structure
disclosed in the specification is "corresponding" structure
only if the specification or prosecution history clearly
links or associates that structure to the function recited
in the claim.'" Med. Instrumentation & Diagnostics Corp.
v. Elekta AB, 344 F.3d 1205, 1210 (Fed. Cir. 2003)
(citation omitted). If no structure for performing the
claimed function is disclosed, the claim is invalid for
indefiniteness. See, e.g., Cardiac Pacemakers, Inc. v. St.
Jude Med., Inc., 296 F.3d 1106, 1114 (Fed. Cir. 2002).

## IV. THE DISPUTED LIMITATIONS

The parties dispute the definition of the
following claim terms: "computer jukebox," found in all
claims; "user attract mode," found in claims 1-6, 15, and
21-25 of the '575 Patent and claim 4 of the '189 Patent;
"graphics," found in claims 4, 6, 11, 21, and 25 of the

8

'575 Patent and claims 3 and 4 of the '189 Patent;
"selection keys," found in all claims of the '189 Patent;
"song selector," found in claims 1-6, 15, and 21-25 of the
'575 Patent; "a song selection means displayed on said
visual screen, actuable by a user for retrieving and
playing a signal representing a song selected from a
plurality of songs stored in said jukebox," a means-plus-
function limitation found in claims 1 and 2 of the '398
Patent; "a programmable memory storing said song data
representing the plurality of songs, said programmable
memory also storing said advertisement data representing
the at least one advertisement," found in claims 3-7 and 9
of the '834 Patent; "said data storage unit having a song
storage location storing song data and an advertisement
storage location receiving advertisement data," found in
claims 3-7 and 9 of the '834 Patent; "said advertisement
data includes at least one time for said at least one
advertisement to be run," found in claims 10-15 and 17 of
the '834 Patent; "data representing when and the number of
times each of said advertisements is to be run," found in
claims 1 and 2 of the '834 Patent and all claims of the
'398 Patent; "a number of times and when said at least one
advertisement is to be run by said computer jukebox," found
in claim 7 of the '834 Patent; "the song record including

song identity data comprising at least one of a song title, a song category, song address, song size, graphics address, graphics size, and play count," found in all claims of the `575 Patent; and "adapted for," found in claims 1-6, 9-11, 15, and 21 of the `575 Patent and all claims of the `189 Patent.

## A. "computer jukebox"

In its responsive brief, Arachnid accepts Touchtunes' proposed definition of "computer jukebox" as "a stand-alone unit operable solely by a patron, including a money intake unit, that plays and is capable of playing songs, as that term is used herein." Since this claim term is no longer disputed, the term is given Touchtunes' proposed definition.[1]

---

[1]     The parties agreed that the term "song" is construed as a "studio-quality musical recording." (See Arachnid Br. 7.) In its responsive brief, Arachnid has asserted that "the parties now agree that 'songs' are 'musical recordings,'" suggesting that the term "studio-quality" had been dropped from the definition. (Arachnid Resp. 2.) Touchtunes challenged this assertion during the Markman hearing and in its motion for summary judgment, which turns on the definition of "studio-quality." In response to Touchtunes' summary judgment motion, Arachnid filed a Supplemental Claim Construction Memorandum on March 22, 2010, in which it challenges Touchtunes' definition of "studio-quality" and proposes its own construction for "song." The arguments presented in Arachnid's Supplemental Claim Construction Memorandum will be addressed in the resolution of Touchtunes' summary judgment motion.

10

**B.** **"user attract mode"**

The parties agree that the term indicates a mode "in which graphics are displayed to attract users to the jukebox," but disagree as to when the jukebox is in this mode. Touchtunes proposes that this mode is "triggered by a determination that no song selection is playing on the jukebox," whereas Arachnid proposes that the jukebox is in user attract mode "when the jukebox is not in selection mode."

Touchtunes' proposed construction seeks to introduce a "triggering" element into the claim, although the term "trigger" does not appear in any Arachnid patent. To support its proposed construction, Touchtunes relies on a preferred embodiment which states that, "if no song selection is playing, the processing circuit 121 operates in a user attract mode" and "[i]f, however, a song selection is being played when the block 161 is encountered, the attract mode sequencing does not occur." '575 Patent at 6:39-59. However, the description of the preferred embodiment is the converse of Touchtunes' characterization. Rather than being "triggered," the user

11

attract mode automatically occurs unless a song selection is being played.

Touchtunes' proposed construction is also incorrect because, by incorporating the concept that user attract mode is triggered by a determination that no song is playing, it renders superfluous the phrase "when no song is playing on the jukebox," as recited in claim 4 of the '189 Patent and claim 6 of the '575 Patent. A claim construction that renders claim language superfluous is almost always incorrect. See Stumbo v. Eastman Outdoors, Inc., 508 F.3d 1358, 1362 (Fed. Cir. 2007).

Arachnid's proposed construction is consistent with the plain meaning of the term: it is a mode to attract users to the jukebox that is exited when the user "uses" the jukebox by making a song selection.

The term "user attract mode" is therefore construed to mean "a mode, when the jukebox is not in selection mode, in which graphics are displayed to attract users to the jukebox."

12

## C.    "*graphics*"

Touchtunes proposes that "graphics" be construed
as "images on a computer screen." Arachnid seeks to define
the term as "pictorial images created from image files."

The patents disclose both "graphics" and
"pictorial graphics." As a matter of plain language, the
term "pictorial graphics" describes a subset of the broader
term "graphics," and therefore has a narrower meaning.
Without any basis in the intrinsic record, Arachnid seeks
to eliminate the distinction between these two terms,
effectively proposing that the term "pictorial" be
considered superfluous and that the narrower meaning of
"pictorial graphics" be applied to the more general term
"graphics" throughout the patents. The use of the term
"pictorial graphics" means that "graphics" are not
necessarily pictorial. See Phillips, 415 F.3d at 1314 (use
of the term "steel baffles" "strongly implies that the term
'baffles' does not inherently mean objects made of steel").
Similarly, Arachnid's proposed restriction of graphics to
"images created from image files" finds no support in any
of the patents.

13

Consistent with the ordinary meaning of the claim term and the intrinsic evidence, "graphics" are therefore construed as "images on a computer screen."

### D.   *"selection keys"*

Touchtunes proposes that the term "selection keys" be construed as "mechanical buttons that allow a user to select a song," emphasizing that the keys are separate from the non-mechanical "display" of the jukebox. Arachnid, on the other hand, proposes that the term be construed as "keys that allow a user to select a song."

Because there is no dispute regarding the construction of the term "selection," Touchtunes argues that the proper construction of the term "keys" is essential and that Arachnid's proposed definition fails because it is circular, defining keys as "keys."  To support its proposed construction, Touchtunes cites selected dictionary definitions that define keys as mechanical buttons.  While these definitions conform to Touchtunes' proposed construction, they do not reflect the ordinary meaning of the word "key."  For example, Webster's defines "key" as "a small switch for opening or closing an

14

electric circuit," with no reference to any "mechanical"
quality. Merriam Webster's Collegiate Dictionary 640 (10th
Ed. 1993).

Touchtunes also relies on the separate recitation
of "selection keys" and "display" in the '189 Patent
specifications. It argues that merging the display and
keys would make both terms redundant. See Unique Concepts,
Inc. v. Brown, 939 F.2d 1558, 1561-62 (Fed. Cir. 1991).
However, nothing about the separate recitation suggests or
requires that the keys be mechanical. Moreover, this
separation does not preclude the possibility that selection
keys can be on a visual screen. Touchtunes' reliance on
the preferred embodiments shown in the specification is
improper, as it is impermissible to limit the claim term to
specific preferred embodiments shown in the specification.
See Phillips, 415 F.3d at 1323.

Finally, Touchtunes argues that the Court should
consider the accused products: Touchtunes jukeboxes use a
"touchscreen" computer display for the selection songs,
whereas Arachnid's patents do not disclose a touchscreen.
Although consideration of the accused products may provide
meaningful context, "[a] court may not use the accused

15

products for the sole purpose of arriving at a construction
of the claim terms that would make it impossible for the
plaintiff to prove infringement." Every Penny Counts, Inc.
v. American Express Co., 563 F.3d 1378, 1383 (Fed. Cir.
2009).

Nothing in the intrinsic record requires that
"keys" be "mechanical" or separate from the visual display.
The term "selection keys" is therefore given its plain and
ordinary meaning and construed as "keys that allow a user
to select a song."

### E.    "song selector"

As with "selection keys," Touchtunes proposes a
construction of the term "song selector" — "a mechanical
device, separate from a display, that allows a user to
select a song" — that adds "mechanical" and "separate"
requirements. Arachnid proposes a more general
construction: "a device that allows a user to select a
song."

Touchtunes again contends that the separate
recitation of the terms "display" and "song selector" in

16

the '575 Patent supports the limitations it seeks to

impose.   However, this separate recitation in a specific

preferred embodiment does not require physical separation

between the "song selector" and the display screen, nor

does the fact that the '575 Patent discloses keys and a

keyboard as the selection devices in the preferred

embodiments limit the claim term to "mechanical" devices.

See Phillips, 415 F.3d at 1323.


        For these reasons, consistent with its plain and

ordinary meaning, the term "song selector" is construed as

"a device that allows a user to select a song."


        **F.    "a *song selection means displayed on said
               visual screen, actuable by a user for
               retrieving and playing a signal representing
               a song selected from a plurality of songs
               stored in said jukebox"***


        The parties agree that this disputed claim term

is written in a special form known as "means-plus-

function."   The first step of a means-plus-function

analysis is to construe the claimed function.   See Applied

Med. Res. Corp., 448 F.3d at 1332.   The second step is to

determine if the specification discloses corresponding

structure as performing the recited function.   Id.

17

Touchtunes contends that the claimed function is "retrieving and playing a signal representing a song selected from a plurality of songs stored in said jukebox, the song being selected by a user actuating the visual screen." Arachnid argues that this misstates the function, because it ignores the function of displaying on the visual screen and imports the ambiguous term "actuating" into the claim. Instead, Arachnid proposes that the function is "displaying a plurality of songs and allowing retrieving and playing a signal representing a particular song."

Arachnid's construction of the function improperly eliminates the claim's requirement that the song be retrieved and played by actuation of means "displayed on said visual screen." Moreover, the claim does not recite the function of "displaying a plurality of songs," as Arachnid proposes. Accordingly, the Court agrees with Touchtunes' construction of the function.

Turning to the second step, the only structure disclosed in the patent for retrieving and playing song selections are the selection keys/keyboard 123. '398 Patent 7:44-52. Figure 1 of the '398 Patent clearly shows

18

that the keyboard 123 is separate from the display and
therefore not actuable through the visual screen.  Pursuant
to 35 U.S.C. § 112, ¶ 6, for means-plus-function claim
terms a corresponding structure must be identified in the
specification and must be clearly linked or associated to
the function recited in the claim.  Med. Instrumentation &
Diagnostics, 344 F.3d at 1210.[2]  Here, the patent lacks the
required disclosure of corresponding structure for a user-
actuated visual screen.

        Since the specification fails to disclose a
structure that corresponds to the function in this means-
plus-function claim, the claim is indefinite and therefore
invalid.  See Cardiac Pacemakers, 296 F.3d at 1114.

> **G.    "a programmable memory storing said song
> data representing the plurality of songs,
> said programmable memory also storing said
> advertisement data representing the at least
> one advertisement"**

        Arachnid contends that there is no dispute that
the memory in this term stores songs and data, and that

---

[2]     While the term "selection keys" in the '198 Patent was not
limited by specific preferred embodiments described in the
specifications, the rules of construction for means-plus-function claim
terms require a different analysis.  If no corresponding structure is
specifically disclosed in the specification, the claim is invalid.

therefore the plain and ordinary meaning of "programmable memory" is "computer memory that can be programmed." Touchtunes challenges this proposed construction, arguing that it ignores the requirement that a programmable memory "store both said song data and said advertisement data." (Touchtunes Resp. 12.) Touchtunes therefore proposes the following construction: "A computer storage device that stores both said song data and said advertisement data."

Arachnid takes issue with Touchtunes' use of the term "device" to restrict the claim term to a single physical piece of equipment, contending instead that the programmable memory is not required to be in a single place or serve a single function, because the claim term uses the indefinite article "a" to qualify "programmable memory." See Baldwin Graphic Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1342-43 (Fed. Cir. 2008) (observing that "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more'"). However, the plain language of the disputed claim term makes it clear that the same programmable memory storing said song data must also store said advertisement data, because "said programmable memory" necessarily refers back to the "a programmable memory" recited earlier in the claim. See, e.g., Intamin,

20

Ltd. v. Magnetar Tech. Corp., 483 F.3d 1328, 1333 (Fed.
Cir. 2007) (use of the word "said" in a claim refers to an
earlier use of that term in the claim).  While the Baldwin
case cited by Arachnid acknowledged the rule that "a" and
"an" mean "one or more" and also held that the subsequent
use of "the" or "said" does not change the potentially
plural nature of the "one or more" structures claimed, 512
F.3d at 1342-43, it does not hold that a limitation
requiring "said" structure to perform two tasks could be
satisfied by splitting those tasks among multiple
structures.  Here, at least one programmable memory must
itself store song data while "also storing said
advertisement data" to satisfy the express limitation in
the claim.

        Arachnid relies on an opinion from a case in the
Northern District of Illinois, in which the Honorable
Matthew F. Kennelly rejected a construction of this same
term that limited programmable memory to a "particular type
of memory."  Rowe Int'l Corp. v. Ecast, Inc., No. 06 C
2703, 2008 WL 5100319, at *2 (N.D. Ill. Nov. 28, 2008).  In
this case, however, Touchtunes does not seek to limit the
term to a particular type of memory or challenge the notion
that a programmable memory is a "computer memory that can

21

be programmed," but rather it argues that the term requires
both song data and advertisement data to be stored in the
same programmable memory.

For the foregoing reasons, the Court adopts
Touchtunes' proposed construction.

> **H.     "said data storage unit having a song
> storage location storing song data and an
> advertisement storage location receiving
> advertisement data"**

Touchtunes argues that the "song storage location
storing song data" and the "advertisement storage location
storing advertisement data" in this term are expressed as
separate and predefined storage locations in the data
storage unit and proposes that the term be construed as "a
data storage unit having separate structural advertisement
and song locations within the data unit." Arachnid
contends that the only word of this claim term about which
the parties disagree is "location," which it defines as "a
place in the memory where information is stored."  Contrary
to Arachnid's contention, however, Touchtunes appears to
agree as to the definition of location.  The parties

disagree as to whether these locations are "separate" and "structural."

Touchtunes' proposed construction tracks the specification, which discloses that the "advertisement data is stored at a separate location on the storage unit 93 so that they can be easily located and tracked." '834 Patent 9:11-12. Touchtunes' construction is also supported by Arachnid's statements to the PTO during the prosecution of the '834 Patent, when it sought to distinguish the prior art ("Wain" and "William"):

> Clearly, a separate advertisement location within the data storage unit is a structural limitation . . . . Much like Wain, William simply does not describe separate structural advertisement and locations within a data storage unit.

Decl. of Joseph S. Presta ("Presta Decl."), Ex. 14. Arachnid argues that this statement is taken out of context and that it merely conveys Arachnid's argument that the prior art did not teach advertising, much less a data storage unit with locations for advertisement and song data. The Court agrees with Touchtunes, however, that Arachnid sought to distinguish the prior art by relying on separate and predefined storage locations for song data and advertisement data. Arachnid may not now change its

23

position. See Bd. of Regents of the Univ. of Texas Sys. V. BENQ Am. Corp., 533 F.3d 1362, 1372-73 (Fed. Cir. 2008).

Arachnid also cites Judge Kennelly's rejection in the Ecast case of a "structural" or "physical" limitation in this term. However, the prosecution history was not discussed in the Ecast decision, and there is no suggestion in Touchtunes' proposed construction that "structural" means "physical." Rather, Touchtunes clarifies that the term "structural" corresponds to the terms "folders" or "subfolders" used by Arachnid, in that it describes a predefined and preexisting place for receiving and storing particular data.

Touchtunes' proposed construction is consistent with the intrinsic evidence, including the prosecution history of the '834 Patent. The disputed term is therefore construed as "a data storage unit having separate structural advertisement and song locations within the data unit."

I. *"said advertisement data includes at least one time for said at least one advertisement to be run"*

The dispute regarding this term centers on the definition of the words "at least one time." Touchtunes proposes that term be construed as "at least one predetermined time," whereas Arachnid proposes that it be construed as "data which permits a determination of a time within which, or event in relation to which, said advertisement will be run."

Touchtunes notes that the patents describe the object of "the present invention" as having the jukebox run downloaded advertisements "at specified times." '398 Patent 2:43-48; '834 Patent 2:52-57. In discussing the only embodiment relating to the "at least one time" (or "when") the advertisement is to be run, the patents teach that the management system tells the jukebox "at what times" the advertisement should be run and that "[t]he advertisements can then be displayed at the predetermined times on the visual display 125." '398 Patent 9:4-8. While "at least one time" (or "when") could refer to a specific time of day, nothing in the language cited by Touchtunes requires such a limitation: it is clear that

25

"at least one time" can refer to a time related to an event, not merely a time of day. The specification even contemplates the possibility that an advertisement may not be run at all. See '398 Patent 9:17-21. This suggests that "at least one time" must include an event in relation to which the advertisement should be run, such that if the event does not occur, the advertisement does not run.

Furthermore, it is improper to import the limitations from the preferred embodiment cited by Touchtunes into the claim term. See Phillips, 415 F.3d at 1320.

For these reasons, the Court agrees with Arachnid and construes the term as "data which permits a determination of a time within which, or event in relation to which, the advertisement will be run."

### J.    "data representing when and the number of times each of said advertisements is to be run"

Touchtunes' proposed construction for this claim term, "data that tells the jukebox at what predetermined time each advertisement is to be run and the total amount

26

of times the jukebox is to run each advertisement," renders the "number of times" language superfluous. If the specific time for each advertisement were included in the data, there would be no need to include data regarding the "number of times" the advertisement should be run. A construction that renders claim language superfluous is contrary to basic claim construction principles. See, e.g., British Telecomms. PLC v. Prodigy Commc'ns Corp., 189 F. Supp. 2d 101, 113 (S.D.N.Y. 2002) ("[N]o claim language may be interpreted as mere surplusage.").

The term "when" in this claim is used in a similar way as the term "at least one time" in the previous claim term and is therefore construed as "a time within which, or event in relation to which" the advertisement is to be run, as Arachnid proposes. While this may include a predetermined time of day, it may also include information describing the time to run the advertisement by reference to an event, such as before, during, or after the event.

Touchtunes proposes that "number of times" be construed as "the total amount of times the jukebox is to run each advertisement," again seeking to import limitations from preferred embodiments into the claim.

Arachnid proposes instead that it be construed as "the frequency an advertisement will be run within a given period." Touchtunes correctly points out that a frequency is determined by the number of occurrences over a given period of time, and that Arachnid's construction therefore contains a redundancy. However, the jukebox's ability to track the number of times an advertisement has actually run, see '398 Patent 9:17-29, supports Arachnid's proposition that "number of times" refers to the frequency with which the advertisement will be run. If "number of times" were construed as how many times a day, as Touchtunes proposes, there would be no reason to track the number of times an advertisement has actually run.

This term is therefore construed as "data which permits a determination of a time within which, or event in relation to which, the advertisement will be run and the frequency an advertisement will be run." This construction eliminates the redundant "within a given period" in Arachnid's proposed construction.

28

**K.    "a number of times and when said at least
       one advertisement is to be run by said
       computer jukebox"**

For the reasons set forth above, "number of

times" is construed as "frequency an advertisement will be

run" and "when" is construed as "a time within which, or

event in relation to which."  The Court therefore adopts

Arachnid's proposed construction of this term.

**L.    "the song record including song identity
       data comprising at least one of a song
       title, a song category, song address, song
       size, graphics address, graphics size, and
       play count"**

Touchtunes contends that the conjunctive language

in this claim term requires that the song record include at

least one of each of the categories of information listed,

whereas Arachnid contends that the song record only

requires at least one of the categories of data.

The plain meaning of "at least one of . . . and"

is conjunctive and requires at least one of each category

unless the intrinsic records requires a departure from such

plain meaning.  See, e.g., SuperGuide Corp. v. DirecTV

Enters., Inc., 358 F.3d 870, 885-87 (Fed. Cir. 2004); cf.

29

Joao v. Sleepy Hollow Bank, 348 F. Supp. 2d 120, 123-26
(S.D.N.Y. 2004) (the phrase "at least one of . . . and"
should be construed to require the presence of all listed
items unless doing so would contradict the specification or
"render the claims utter nonsense").

Arachnid cites the '575 Patent specification as
evidence in the intrinsic record of a departure from a
conjunctive interpretation of the disputed claim term.
Arachnid characterizes the '575 Patent specification as
explaining that a song record is "a collection of song data
representing one or more identifying characteristics of a
song." (Arachnid Resp. 20 (emphasis in original).)
However, nothing in the cited specification indicates that
song data consists of "one or more" of the characteristics,
as opposed to at least one of each. The only indication
that certain fields may be blank is in the description of
the "graphics address field," which is used for "a graphic
image, if any, to be associated with a song." '575 Patent
3:48-53. But the "if any" language does not make the
inclusion of graphics address data optional, but rather
allows for the possibility that the data might indicate
that no graphic image is associated with the song.

Arachnid also argues that Touchtunes' proposed construction would render the phrase "at least one of" superfluous because the song record would always include data in each of the listed categories. This argument is incorrect, because even if data were always included in each of the listed categories, the phrase "at least one of" allows for the inclusion of more than one piece of data in some of the categories.

The Court therefore adopts Touchtunes' proposed construction.

### M.    "adapted for"

Touchtunes proposes that the phrase "adapted for" as used in the various claims of the '575 Patent and the '189 Patent means "physical modification of a structure specifically for the use as further set forth in the claim." This construction is based on the prosecution history of these patents, during which Arachnid amended claims to add the "adapted for" language to certain previously recited structures. (See, e.g., Presta Decl. Ex. 16 at 2 (changing the phrase "a display presenting song selections" to "a display adapted for presenting song

31

selections").)   These amendments were intended "to better clarify applicants' contribution to the art."   (Id. at 7.) The modification of the claims to include the "adapted for" clause establishes that the clause is a limitation.   See Manual of Patent Examining Procedure § 2111.04 (using "adapted for" as an example of claim language that may have a limiting effect and stating that "[t]he determination of whether [this] clause[] is a limitation in a claim depends on the specific facts of the case").

In contrast, Arachnid proposes that the term be construed as "combined and/or applied for use as further set forth in the claim."   The phrase "applied for use" would not require any adaptation at all.   Indeed, under Arachnid's proposed construction, for example, any unmodified display necessarily would be "adapted for presenting song selection" merely because the display operates in response to signals instructing it to present song selection.   This construction removes the difference between the original and amended claims submitted by Arachnid during the prosecution of the patent and effectively reads the term "adapted for" out of the claims.

Touchtunes' proposed construction is consistent
with the intrinsic record, including the prosecution
history.  The term "adapted for" is therefore construed as
"physical modification of a structure specifically for the
use as further set forth in the claim."

**V.    CONCLUSION**

For the reasons set forth above, the disputed
claim terms are given the definitions set forth in this
opinion.

It is so ordered.

New York, NY
July  2/ , 2010

ROBERT W. SWEET
U.S.D.J.

33