UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

TOUCHTUNES MUSIC CORP.,

                    Plaintiff,                07 Civ. 11450

        -against-                             OPINION

ROWE INTERNATIONAL CORP., ARACHNID,
INC., AMI ENTERTAINMENT, INC. and
MERIT INDUSTRIES, INC. a/b/a MERIT
ENTERTAINMENT,
                    Defendants.

------------------------------------X

ARACHNID, INC.,

          Counterclaim Plaintiff,

        -against-

TOUCHTUNES MUSIC CORP.,

          Counterclaim Defendant.

------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff
        TouchTunes Music Corp.

        NIXON & VANDERHYE, P.C.
        901 North Glebe Road, Suite 1100
        Arlington, VA  22203
        By:  Joseph S. Presta, Esq.
             Jonathan T. Reavill, Esq.

        KAYE SCHOLER LLP
        425 Park Avenue
        New York, NY  10022-3589
        By:  James S. Blank, Esq.

Attorneys for Defendant
Arachnid, Inc.

McANDREWS, HELD & MALLOY, LTD.
500 West Madison, 34th Floor
Chicago, IL  60661
By:  James P. Murphy, Esq.
     Paul W. McAndrews, Esq.

**Sweet, D.J.**

Plaintiff TouchTunes Music Corporation ("TouchTunes" or "Plaintiff") filed the instant patent infringement action seeking a declaratory judgment of noninfringement and invalidity of certain software patents, used largely in electronic jukeboxes, owned by Defendant and Counterclaimant Arachnid, Inc. ("Arachnid") as well as a finding of infringement of certain of TouchTunes' patents.   Arachnid has counterclaimed alleging TouchTunes' infringement as to five of its patents.

Presently at issue is the construction certain claims with respect to one of the patents that is the subject of TouchTunes' claims and Arachnid's counterclaims, Arachnid's U.S. Patent No. 6,191,780 (the "'780 Patent").   Pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the parties have submitted briefing regarding their proposed construction of disputed claim terms with respect to the '780 Patent.

On September 2, 2011, TouchTunes sought leave under Rules 15(a) and 16(b) of the Federal Rules of Civil Procedure to amend the complaint to add claims for patent unenforceability due to inequitable conduct.

1

Oral argument on the motion to amend was heard in conjunction with a Markman hearing on the '780 Patent on October 18, 2011.

The Court's construction of the disputed claim terms is set forth below and, for the reasons below, TouchTunes' motion to amend is granted.

## I.   PRIOR PROCEEDINGS

On December 20, 2007, TouchTunes filed its complaint alleging that defendants Rowe International Corp. ("Rowe"), AMI Entertainment, Inc., and Merit Industries, Inc. (collectively, the "Rowe Defendants") infringed three of TouchTunes' U.S. Patents.   TouchTunes also sought a declaratory judgment of noninfringement and invalidity of certain patents owned by Arachnid.   On February 15, 2008, Arachnid counterclaimed that TouchTunes infringed four of those patents.

In or about April 2009, TouchTunes and the Rowe Defendants entered into a settlement agreement, pursuant to which TouchTunes' affirmative claims against the Rowe Defendants and its declaratory judgment action against Rowe were both dismissed.

2

Arachnid moved for a transfer of venue and to stay the proceedings pending the ex parte reexamination of certain of Arachnid's patents, both of which were denied by an opinion filed December 15, 2009.

On March 19, 2010, TouchTunes filed a motion for summary judgment and oral argument was heard on May 26, 2010.

On March 23, 2010, the Court held a Markman hearing to address issues of construction of certain terms of the claims-in-suit.

Following the Court's grant of Arachnid's motion for leave to file a first amended answer and counterclaim on May 11, 2010, Arachnid added a fifth patent to its counterclaims on May 14, 2010.

By opinion of July 21, 2010, the Court issued an opinion construing the claims subject to the March, 2010 Markman hearing.

By opinion of October 5, 2010, TouchTunes' motion for summary judgment was denied.

On April 7, 2011, TouchTunes filed a motion for partial summary judgment of noninfringement regarding Arachnid's U.S. Patent No. 5,848,398 ("the '398 Patent"), U.S. Patent No. 6,397,189 ("the '189 Patent"), U.S. Patent No. 6,381,575 ("the '575 Patent"); and U.S. Patent No. 5,930,765 ("the '765 Patent").

On May 31, 2011, the Court so ordered a stipulation rendering TouchTunes' motion for partial summary judgment moot and providing, inter alia, that (1) claims 1-7 of the '398 Patent had been found invalid; (2) TouchTunes had not infringed any claim of the '189 Patent; (3) TouchTunes had not infringed any claim of the '575 Patent; (4) dismissing without prejudice TouchTunes' claims with regard to the '189 and '575 Patents; and (5) dismissing without prejudice TouchTunes' claims with regard to the '765 Patent in light of Arachnid's stipulation that it will not assert a claim against TouchTunes alleging infringement of the '765 Patent.

On September 2, 2011, TouchTunes filed a motion to amend the complaint to add claims for patent unenforceability due to inequitable conduct.

4

That motion and the claim construction briefing regarding the '780 Patent were marked fully submitted on October 18, 2011 following oral argument and the Markman hearing.

Familiarity with the facts of this dispute are assumed.

## II. THE LEGAL FRAMEWORK AND APPLICABLE STANDARD FOR CLAIM CONSTRUCTION

Claim construction is an issue of law to be determined by the court. Markman, 517 U.S. at 385. In interpreting the meaning of claim terms, "words of a claim 'are generally given their ordinary and customary meaning'" as understood by "a person of ordinary skill in the art at the time of invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (citations omitted). The court reads a claim term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. at 1313.

The Federal Circuit has emphasized the importance of "intrinsic" evidence in claim construction: the words of the claim themselves, the written description in the patent's

5

specification, and, when necessary, the history of the patent application's prosecution before the U.S. Patent and Trademark Office (the "PTO"). Id. at 1314-17.

The process of claim construction begins with the language of the claims themselves, which the patentee selected to "'particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention.'" Id. at 1311-12 (quoting 35 U.S.C. § 112). Thus, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." Id. at 1314. In addition to the particular claim being examined, the context provided by other claims may be helpful as well. Id.

Claim language must also be read in the context of the specification. Id. at 1315. The specification "'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" Id. (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). When the patentee "act[s] as his or her own lexicographer" and includes an explicit definition of a claim term in the specification, that definition is dispositive. Id. at 1319 (citation omitted). The specification also acts as a dictionary "when it defines terms

6

by implication." Vitronics, 90 F.3d at 1582. However, when relying on the specification to interpret claim terms, a court should not be confined to the embodiments described in the specification. Phillips, 415 F.3d at 1323. The mistake of "reading a limitation from the written description into the claims" is "one of the cardinal sins of patent law." Id. at 1320 (quoting SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1340 (Fed. Cir. 2001)).

"In addition to consulting the specification, we have held that a court 'should also consider the patent's prosecution history, if it is in evidence.'" Id. at 1317 (citations and quotation marks omitted). The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. at 1317 (citations omitted). However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Id.

7

Finally, courts may rely on "extrinsic" evidence such as dictionaries, learned treatises, and expert testimony, which may serve as a source of "accepted meanings of terms used in various fields of science and technology" or provide "background on the technology at issue." Id. at 1317-18. However, such extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language," and should be considered in the context of the intrinsic evidence. Id. at 1317-19 (citations and quotation marks omitted); see also Biagro W. Sales, Inc. v. Grow More, Inc., 423 F.3d 1296, 1302 (Fed. Cir. 2005).

## III. THE DISPUTED CLAIM TERMS

The disputed claim terms of the '780 Patent are as follows: "multimedia segment structure," "multimedia effect," "control segment," "definition segment," "placeholder tokenized argument," "argument definition of the tokenized argument," "customizing the predefined advertisement for local display," "play sequence listing the definition segment," "segment association," "memory" and "literal argument."

The primary relevant claim language, found in claims 1 and 9, is as follows:

8

1.  An electronic device for executing a customized advertisement multimedia display, the electronic device comprising:

   a memory storing a multimedia segment structure, the multimedia segment structure comprising:

   a.  a control segment implementing a predefined advertisement and comprising at least one multimedia command invoking at least one multimedia effect, the multimedia command including a placeholder tokenized argument; and

   b.  a definition segment comprising a segment association invoking the control segment and an argument definition of the tokenized argument, the argument definition customizing the predefined advertisement for local display;

   the memory also storing a play sequence listing the definition segment and thereby determining when the multimedia segment structure is executed;

   and

   a processor for executing the multimedia segment structure in accordance with the play sequence.

\*\*\*

9.  The electronic device of claim 1, wherein the control segment further comprises a second multimedia command with a literal argument.

('780 Patent claims 1 & 9 (Dkt No. 192-1.))

### A.   Multimedia Segment Structure

9

The parties are largely in agreement with respect to the construction of "multimedia segment structure" and "multimedia effect." The parties agree that that a "multimedia segment structure" is a portion of a program defining a multimedia display.[1] This is stated in the '780 Patent: "The present invention relates generally to a segment structure which allows electronic devices to generate multimedia displays." ('780 Patent 1:4-7; see also id. at 2:14-27.)

The parties disagree with respect to the meaning of "multimedia." TouchTunes argues that "multimedia," by dint of the prefix "multi-," means that the display must comprise at least two different types of media. For this proposition TouchTunes points to a dictionary definition and that the patent includes the following language: "[s]till a further object of the present invention is to provide a mechanism for downloading and storing multimedia displays defined by a multimedia segment structure as well as executing the multimedia segment structure to generate the multimedia displays on a display, speakers, and the like associated with the electronic device." ('780 patent 2:22-28; see also id. at 1:25-28 ("Any electronic device including even rudimentary audio, video, or other effects may be

---

[1] Touchtunes uses the term "presentation" instead of "display." These terms presumably have identical meaning. However, as "display" is used in the patent, the Court adopts that term.

used to communicate information, for example, advertisements, via multimedia presentations."), 4:34-42 (including, <u>inter alia</u>, "ordered sequences of commands may instruct the electronic device to generate lines, circles, or other graphics on a display, and control internal or external lights, buzzers, flags, alarms and the like connected to the electronic device.")

Arachnid contends that "multimedia" indicates the capability of presenting multiple forms of media, one or more at a time, not that multiple, different forms of media must be simultaneously presented.  Arachnid argues that its proposed construction is consistent with the patent specification, which identifies several exemplary "multimedia commands" each of which displays a single media form, and with the plain meaning of the term.  Arachnid also points to the declaration of Dr. James Storer for the proposition that its construction is consistent with the understanding of a person of ordinary skill in the art. (<u>See</u> Storer Decl. 7 (Dkt. No. 192-3).)

The preferred embodiment disclosed in the '780 Patent shows a control segment with three multimedia commands, "CIRCLE," "LINE," and "TEXT." ('780 Patent Figure 2, 4:55-5:30; <u>see also</u> <u>id.</u> at 2:62-3:3 (describing various media forms).) Each of these commands presents one form of media.  To construe the

11

"multimedia" to require that at least two different forms of media must always be simultaneously presented, as TouchTunes urges, would be incorrect because it would exclude preferred embodiments of the '780 Patent. This construction is therefore rejected. See Verizon Servs. Corp. v. Vonage Holdings Corp.; 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification."); Primos Inc. v. Hunter's Specialties Inc., 451 F.3d 841, 848 (Fed. Cir. 2006) ("[W]e . . . should not normally interpret a claim term to exclude a preferred embodiment." (citation omitted)); Vitrionics, 90 F.3d at 1583 (stating a construction that excludes the preferred embodiment "is rarely, if ever correct and would require highly persuasive evidentiary support" (citations omitted)).

Accordingly, consistent with the ordinary meaning of "multimedia," "multimedia segment structure" is construed to be "a portion of a program defining a multimedia display, where a multimedia display is a display which can present multiple content forms, one or more at a time, such as audio, video, graphics, images, or text."

12

### B.   Multimedia Effect

As with "multimedia segment structure," the parties are largely in agreement and disagree only as to the meaning of "multimedia." The parties agree that "multimedia effect" should be construed as the display of media, and Arachnid proposes that this be "the display of any type of multimedia content, such as audio, video, graphics, images, or text" while TouchTunes argues that this term be defined as "the display of at least two different types of media."

Arachnid's proposed construction is consistent with the patent specification. First, the claim language makes clear that this term refers to any single media form. The relevant claim language states, "multimedia command invoking at least one multimedia effect." ('780 Patent 7:35-36.) TouchTunes' proposal would render the words "at least one" superfluous. A claim construction that renders claim language superfluous is almost always incorrect. See Stumbo v. Eastman Outdoors, Inc., 508 F.3d 1358, 1362 (Fed. Cir. 2007). In addition, as earlier discussed, TouchTunes' construction would exclude the preferred embodiment disclosed in the patent, a construction that is "is rarely, if ever correct." Vitrionics, 90 F.3d at 1583.

13

The term "multimedia effect" is therefore construed to be "the display of media content, such as audio, video, graphics, images, or text."

### C.   Control Segment

TouchTunes proposes that "control segment" be construed as "the portion of the multimedia segment structure that implements the predefined advertisement." Arachnid seeks to define the term as "a portion of a program that includes commands that invoke multimedia effects or perform control functions."

The parties are in agreement that the "control segment" is a portion of the "multimedia segment structure," and the plain claim language, the patent specification and the prosecution history all make clear that this is the case. (See, e.g., '780 patent at claim 1, 2:39-51, 3:18-22, 4:20-25, Fig. 2; Ex. 6 at 6, 10-13.) The parties disagree, however, whether this fact should be reflected in the construction of the term "control segment," with Arachnid arguing that incorporation of "multimedia segment structure" is redundant while TouchTunes argues it is necessary.

14

The claims recite that the multimedia segment structure comprises of "a control segment implementing a predefined advertisement and comprising at least one multimedia command invoking at least one multimedia effect, the multimedia command including a placeholder tokenized argument" and "a definition segment comprising a segment association invoking the control segment and an argument definition of the tokenized argument, the argument definition customizing the predefined advertisement for local display." ('780 Patent claim 1.)

In addition, during prosecution, Arachnid narrowed the scope of the control segment to one "implementing a predefined advertisement and comprising at least one multimedia command invoking at least one multimedia effect . . . ." (Reavill Decl. Ex. 6 at 6 (Dkt. No. 191-6.) Arachnid argued to the PTO that:

> Thus, as described in the specification, the control segment is responsible for presenting a multimedia presentation (e.g., for a predefined advertisement template), while the definition segment provides definitions of tokenized arguments in the control file that may be used to customize (e.g., for local distribution) the predefined advertisement template. . . . . In addition, the amended claims now recite that the control segment implements a predefined advertisement template using at least one multimedia command with a tokenized argument. A supporting definitional segment provides customization by providing a locally modifiable definition for the tokenized argument.

15

(Id. at 10-11.)   Thus, the intrinsic evidence requires that the control segment implement the predefined advertisement and that the definition segment contain the customization for the predefined advertisement.

Because a construction of "control segment" that reflects that it is a proportion of the multimedia segment structure is in keeping with the plain claim language, the patent specification, the prosecution history, and the understanding of the parties, and serves to clarify the term, the Court adopts that construction.

Next, Arachnid's construction states that the control segment "includes commands that invoke multimedia effects or perform control functions."   Due to the use of "or," this construction permits the invocation of multimedia effects to be optional.   However, the claims require the control segment to include a multimedia command and the multimedia command to invoke a multimedia effect. (See, e.g., '780 patent claim 1; see also Reavill Decl. Ex. 6 at 12.)

TouchTunes proposal that "control segment" be construed as "the portion of the multimedia segment structure

16

that implements the predefined advertisement" is therefore adopted.

### D. Definition Segment

TouchTunes proposes that the term "definition segment" be construed as "a portion of the multimedia segment structure, distinct from the control segment, that itself contains the customization for the predefined advertisement." Arachnid, on the other hand, proposes that the term be construed as "a portion of a program that provides a definition or definitions of tokenized arguments."

The parties agree that the definition segment is used to define something. Arachnid proposes that definition segment be construed as "a portion of a program" that provides such definition while TouchTunes proposes to include in that the definition segment is part of the multimedia segment structure. For largely the reasons set forth with respect to the control segment, TouchTunes' inclusion of this language is clarifying and in keeping with the intrinsic evidence. (See, e.g., '780 patent at claim 1, 2:39-51, 3:18-22, 4:20-25, Fig. 2; Reavill Decl. Ex. 6 at 6, 10-11.)

17

In addition, TouchTunes seeks to add that the definition segment is "distinct from the control segment." While the function of the control and definition segments are clearly different, that they must be distinct in every sense is not found in the claim language or specification and is contrary to the latter. (See '780 Patent 7:17-19 ("Furthermore, a control segment and associated definition segments may be concatenated into a single file for storage, retrieval, or transmission purposes."). This aspect of TouchTunes' proposal is therefore rejected.

Accordingly, the claim term "definition segment" is construed to be "a portion of the multimedia segment structure that contains the customization for the predefined advertisement."

## E.  Placeholder Tokenized Argument

With respect to "placeholder tokenized argument," TouchTunes argues that this term should be construed as "a fixed (i.e. non-variable) reference in the multimedia command for a definition that is itself contained in the definition

segment," while Arachnid argues for "an element in a command representative of an actual argument."

The parties' primary disagreement is whether the placeholder tokenized argument is fixed or may be variable. The parties agree that the prosecution history regarding Arachnid's arguments as to the Liu reference bears on this point.

TouchTunes argues that the prosecution history of the '780 Patent underscores that there is a direct relationship between the placeholder tokenized argument and the argument definition. TouchTunes points out that its original form, issued claim 1 (i.e., application claim 9) recited "a tokenized argument" and "at least one argument definintion [sic] corresponding to the tokenized argument." (Reavill Decl. Ex. 4 at 26-27 (Dkt. No. 191-4), Ex. 6 at 6-7.) The PTO rejected the claim in view of the Liu reference, a patent disclosing a karaoke system in which song lyrics are highlighted on a display as the corresponding music is played. (Reavill Decl. Ex. 5 at 6-7 (Dkt. No. 191-5).) The PTO cited Liu as disclosing, among other things, a multimedia command including "a tokenized argument," as well as "at least one argument definition corresponding to the tokenized argument." (Reavill Decl. Ex. 5 at 7.) In response to that rejection, Arachnid amended the

19

claim to add that the tokenized argument was a "placeholder" tokenized argument and distinguished Liu on that basis. (Reavill Decl. Ex. 6 at 6, 12-13.) Arachnid argued that Liu discloses only the use of a variable "n" and that such a variable is different than the claimed placeholder tokenized argument:

> While Liu may use a counter (e.g., the variable 'n') as an index into a set of lines, the claimed invention recites a multimedia command with placeholder tokenized argument. In other words, the tokenized argument is replaced by a definition for the tokenized argument provided in the definition segment. The variable 'n' in Liu is not a placeholder because it clearly must be maintained as a counter. This follows from the fact that there is no replacement definition or substitution for the variable 'n', rather the variable 'n' presumably indexes an array of strings that vary in content as 'n' increments. The claimed invention, on the other hand, recites that the tokenized argument is a placeholder in an actual multimedia command for a definition provided in a definition segment. The control segment / definition segment structure thereby allows local operators to modify the definition segment to customize advertisements for appropriate local display.

(Reavill Decl. Ex. 6 at 12-13.) Arachnid amended the claims to explicitly require that the argument definition contained in the definition segment customize the predefined advertisement. (Reavill Decl. Ex. 6 at 7.)


Arachnid argues that the placeholder tokenized argument is not a fixed value but instead the purpose of a placeholder tokenized argument is to provide the ability to

20

change its value to modify or customize what is ultimately displayed by the multimedia segment structure. (See, e.g., '780 Patent 2:45-50 ("The [definition] segment also includes one or more argument definitions corresponding to the tokenized arguments used in the [control] segments. Thus, the [definition] segment may customize a multimedia display by changing the value of the tokenized argument."), 5:49-52 ("The supporting [definition] segment may be modified by route operators to create custom advertisements simply by changing the values of the tokenized arguments in a definition segment.")

The parties' positions are not fundamentally at odds. Arachnid is correct that placeholder tokenized arguments may be replaced by customizable tokenized arguments. (See, e.g. Reavill Decl. Ex. 6 at 12 ("As claimed, the argument definition customizes the predefined advertisement for local display . . . In other words, the tokenized argument is replaced by a definition for the tokenized argument provided in the definition segment.")  The '780 Patent states:

> The [definition] segment also includes one or more argument definitions corresponding to the tokenized arguments used in the [control] segments. Thus, the [definition] segment may customize a multimedia display by changing the value of the tokenized argument. . . . Note that the commands accept one or more arguments, either in literal form (for example, specifically naming text, XY locations, or filenames

21

as in "arachnid.bmp"), or in a tokenized form in which identifiers (for example, ATESTA) are used as placeholders for an actual argument. . . . The supporting [definition] segment may be modified by route operators to create custom advertisements simply by changing the values of the tokenized arguments in a definition segment.

('780 Patent 2:45-50, 5:31-36, 5:49-52.)   An express purpose of a "placeholder" tokenized argument is, thus, to provide the ability to customize the advertisement displayed by the multimedia segment structure.

At the same time, TouchTunes correctly points out that Arachnid limited its claims in light of <u>Liu</u> such that the placeholder tokenized argument is not a variable, as in <u>Liu</u>, but instead a fixed value that can be replaced by a modifiable argument definition.   Arachnid also amended the claims to delete the language calling for "at least one argument definition corresponding to the tokenized argument." (Reavill Decl. Ex. 6 at 7).   In its place, Arachnid added the narrower requirement for "an argument definition of the tokenized argument." (<u>Id.</u>). Arachnid also added the limitation of "the argument definition customizing the predefined advertisement for local display." (<u>Id.</u>)   Thus, the claims no longer cover "at least one" definition "corresponding to" the tokenized argument. (<u>Id.</u>) These amendments to the argument definition align with

22

Arachnid's distinction of <u>Liu</u> and the amendment narrowing the tokenized argument to a "placeholder." (<u>See, e.g.</u>, <u>id.</u> at 7, 10-13; Reavill Decl. Ex. 8 at 3.) Arachnd's amendments and arguments regarding relationship between the placeholder tokenized argument and the argument definition was significant. The PTO specifically noted that Arachnid "overcame the <u>Liu</u> reference by amending [issued claim 1] to include a **placeholder** tokenized argument and explaining how placeholder was intended to modify the claim." Reavill Decl. Ex. 8 at 3 (emphasis in original); <u>see also</u>, <u>Sea change Int'l, Inc. v. C-COR Inc.</u>, 413 F.3d 1361, 1372-73 (Fed. Cir. 2005) ("Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language." (citation omitted)).

Thus, while a given placeholder tokenized argument is fixed in the sense that is not a retained changing variable as in <u>Liu</u> and can be replaced by only one argument definition (<u>e.g.</u> "TEST" by "This is a test message"), what that argument definition is can be changed.

For these reasons, the Court construes "placeholder tokenized argument" as "a non-variable reference in the

23

multimedia command for a single customizable argument definition."

### F. Argument Definition of the Tokenized Argument

TouchTunes argues that "argument definition of the tokenized argument" should be construed as "a locally modifiable definition that is itself contained in the definition segment and that replaces the placeholder tokenized argument to customize the predefined advertisement" and Arachnid argues this term should be construed as "a definition for the tokenized argument provided in the definition segment."

The parties generally agree that the argument definition of the tokenized argument defines the placeholder tokenized argument and that it is contained in the definition segment. The placeholder tokenized argument is a "placeholder" for a modifiable value, which allows the advertisement to be customized. The definition provides the value that ultimately is used in place of the placeholder.

However, TouchTunes argues that Arachnid's construction fails to recognize that the argument definition is the value that replaces the tokenized argument to customize the

24

predefined advertisement.   In TouchTunes' view, under Arachnid's proposal, the argument definition could be one of many available definitions in the multimedia segment structure for the tokenized argument.   As discussed above, the intrinsic record demonstrates that the argument definition contained in the definition segment provides the customization that replaces the placeholder tokenized argument. (See '780 patent at claim 1, 2:39-51, 5:32-62, 6:10-21; Reavill Decl. Ex. 6 at 6-7, 10-13 ("A supporting definitional segment provides customization by providing a locally modifiable definition for the tokenized argument.").)

Accordingly "argument definition of the tokenized argument" is construed as "a modifiable definition contained in the definition segment that replaces the placeholder tokenized argument."

## G.   Customizing the Predefined Advertisement for Local Display

TouchTunes contends that "customizing the predefined advertisement for local display" should be construed as "modifying the predefined advertisement so that it provides customized information regarding the local area in which the

25

device is located." Arachnid argues that this term should be read to be "modifying attribute(s) of the predefined advertisement to allow information to be displayed to a particular location(s) or device(s)."

The parties' central disagreement over this term regards whether the customized information must relate to the local area in which it is displayed. The claim language itself does not limit customization to information regarding the local areas. In a preferred embodiment, the single argument definition "TEST='This is a test message'" modifies the predefined advertisement by modifying the text which will appear in the text box on that particular device running this multimedia segment structure. ('780 Patent Figure 2.) This customizes for local display but does not contain information from the local area. TouchTunes' proposal would exclude a preferred embodiment and as such is rejected. See Verizon Servs. Corp., 503 F.3d at 1305; Primos Inc., 451 F.3d at 848; Vitrionics Corp., 90 F.3d at 1583 (a construction that excludes the preferred embodiment "is rarely, if ever correct").

TouchTunes' proposal additionally reads into the claim construction an embodiment described in the patent, specifically the "Tony's Pizza" example described at column 6 of the '780

26

Patent, which does include information from the local area. However, "it is improper to read limitations from a preferred embodiment described in the specification — even if it is the only embodiment — into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 913 (Fed. Cir. 2004). No such clear indication exists in the intrinsic record.

Therefore, "customizing the predefined advertisement for local display" is construed in keeping with the plain claim language as "modifying the predefined advertisement so that it provides customized information to be displayed to a particular location(s)."

### H.   Play Sequence Listing the Definition Segment

TouchTunes argues that "play sequence listing the definition segment" should be construed to be "a list including the definition segment itself (i.e. the segment association and the definition argument of the tokenized argument) and other definition segments, arranged in the order in which the multimedia segment structures corresponding to the various definition segments in the list are to be executed." Arachnid

27

contends that this term should be defined as "instructions defining a list of definition segments; the list being either fixed or dynamically determined."

The relevant claim language states:

> the memory also storing a play sequence listing the definition segment and thereby determining when the multimedia segment structure is executed.

('780 Patent claim 1.)

According to the '780 patent's "Detailed Description of the Invention":

> The jukebox 13 generally executes multimedia segment structures according to a play sequence. The play sequence, which may be fixed or dynamically determined, defines which multimedia segment structures to execute and when to execute them. For example, the segment structures may be executed according to a play sequence which proceeds through a list of segment structures sequentially, and loops back to the first segment structure when the end of the list is reached.

('780 Patent 4:24-33.)  Thus, the play sequence, as defined in the '780 Patent, lists the definition segments, thereby determining when the multimedia segment structure is executed, and it may be fixed or dynamically defined.

28

Arachnid added the "listing the definition segment and thereby determining" requirements to the claimed play sequence in response to a prior art rejection from the PTO. (See Reavill Decl. Ex. 6 at 7.)   The original claims recited "a play sequence determining when the multimedia segment structure is executed." (Reavill Decl. Ex. 4 at 27, Ex. 6 at 7.)   The PTO cited Liu as specifically disclosing that play sequence.   (Reavill Decl. Ex. 5 at 11.)   In response, Arachnid amended the claims to recite "a play sequence listing the definition segment and thereby determining when the multimedia segment structure is executed." (Reavill Decl. Ex. 6 at 7.)   Thus, the amended claims explicitly require that the play sequence list the definition segments and make the timing determination according to that list.   Arachnid surrendered coverage of any other type of play sequence. See, e.g., Rheox, Inc. v. Entact, Inc., 276 F.3d 1319, 1325-27 (Fed. Cir.  2002).    It  is  not  clear  what  Arachnid  means  by "instructions defining" a list of definition segments. The play sequence is the list of definition segments. ('780 patent at claim 1.)   Arachnid's construction also does not address the timing aspect of the claim language. ('780 Patent claim 1, 4:24-33, 5:52-57.)

In view of the claim language and prosecution history, "play sequence listing the definition segment" is construed as

29

"a fixed or dynamically determined list of definition segments arranged in the order in which the multimedia segment structures corresponding to the various definition segments are to be executed."

### I.   Segment Association

The parties are in substantial agreement as to the construction of "segment association."   TouchTunes argues that the term should be defined as "a reference to a control segment to be executed" while Arachnid proposes "instructions for referencing or executing another segment structure."

The relevant portion of this claim states: "a definition segment comprising a segment association invoking the control segment."   ('780 Patent claim 1.)   The Patent additionally states:

> Thus, in FIG. 2, the [definition] segment invokes (with the TEMPLATE command) the [control] segment "template.mac". The TEMPLATE command is one example of an association between a definition segment and a [control] segment. Other segment associations may be used, including pointers, program branches, and program jumps, for example.

(Id. at 5:64-6:3.)   Thus, the patent states that the segment association invokes the control segment.

30

In light of the intrinsic evidence, "segment association" is construed as "a reference to a control segment to be executed."

### J.   Memory

TouchTunes argues that "memory" should be construed as "a computer storage device that stores both the multimedia segment structure and the play sequence listing the definition segment," while Arachnid proposes "data storage used by the electronic device."

The parties agree that the "memory," however construed, stores both the multimedia structure and the play sequence.  The parties dispute, however, whether this "memory" must be a single device or refers to the overall data storage capacity of the system.

The '780 Patent states:

> The data storage unit 93 may be implemented as a magnetic memory (for example, a hard disk drive) and/or an optical memory (for example, a Compact Disk drive). . . . The storage unit 93 and associated song library 91 may be an optical memory or any other available large volume nonvolatile computer memory

31

> that provides both read and write access. . . .
> Control segments or definition segments may be
> provided, for example, as files stored on a hard disk
> or the like, as data stored in ROMs or loaded in RAM,
> or as files or data stored on a floppy disk.

('780 Patent 3:29-38, 4:43-45; see also Figure 1 (showing "data

storage unit 93").)  Thus, as defined and as described in the

'780 Patent, the multimedia segment structure and the play

sequence are stored in the data storage unit which, as expressly

stated in the '780 Patent, may comprise, for instance, the

storage capacity of the RAM, the ROM, or the hard drive.

TouchTunes' construction would improperly excluded these

preferred embodiments.  See Vitrionics Corp., 90 F.3d at 1583;

Verizon Servs. Corp., 503 F.3d at 1305; Primos Inc., 451 F.3d at

848.


        That "memory" refers to overall data storage is

further supported by extrinsic evidence. The Institute of

Electrical and Electronics Engineers defines "memory" to be

"[a]ll of the addressable storage in a processing unit and other

internal storage that is used to execute instructions." THE IEEE

STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONIC TERMS 645 (6th

ed. 1996) (Dkt. No. 192-6); see also Atofina v. Great Lakes

Chern. Corp., 441 F.3d 991, 996 (Fed. Cir. 2006) ("one may look

to technical dictionaries for assistance in determining [a]

term's meaning to a person of ordinary skill in the art"
(citation omitted)).

In light of the evidence, the claim term "memory" is
be construed to be "data storage used by the electronic device."

### K.    Literal Argument

The parties do not disagree conceptually as to the
meaning of "literal argument." TouchTunes proposes "a value
that is defined by itself" or, alternatively, "a computer
argument that explicitly recites its own value (for example, the
argument 'print "FAIL"' recites its own value: 'FAIL')."
Arachnid argues that the term should be construed as "a
specified (i.e. non-variable) value for a command."

"Literal argument" is not defined in the claim
language. The '780 Patent states:

> Note that the commands accept one or more arguments,
> either in literal form (for example, specifically
> naming text, XY locations, or filenames as in
> 'arachnid.bmp'), or in a tokenized form in which
> identifiers (for example, ATESTI) are used as
> placeholders for an actual argument.

33

('780 Patent 5:31-36.)   Thus, a literal argument provides a
specified, or "literal," value for something.

As the parties are in conceptual agreement as to the
meaning of literal argument and Arachnid's construction is most
straightforward, the claim term "literal argument" is be
construed to be "a specified (i.e. non-variable) value for a
command."

### L.   Retire

The parties are in agreement that "retire" in claim 4
is a typo, which should read "retrieve."   The Patent is
corrected accordingly. See, e.g., Ultimax Cement Mfg. Corp. v.
CTS Cement Mfg. Corp., 587 F.3d 1339, 1353 (Fed. Cir. 2009);
Lemelson v. General Mills, Inc., 968 F.2d 1202, 1203 n.3 (Fed.
Cir. 1992).

## IV.  TOUCHTUNES' MOTION TO AMEND
### A.   Legal Standard

Rule 15 of the Federal Rules of Civil Procedure
provides that "[t]he court should freely give leave when justice
so requires." Fed.R.Civ.P. 15(a)(2).

34

> In the absence of any apparent or declared reason -
> such as undue delay, bad faith or dilatory motive on
> the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed, undue
> prejudice to the opposing party by virtue of allowance
> of the amendment, futility of amendment, etc. - the
> leave sought should, as the rules require, be 'freely
> given.'

Foman v. Davis, 371 U.S. 178, 182 (1962); see also SCS Commc'ns,

Inc. v. Herrick Co., Inc., 360 F.3d 329, 345 (2d Cir. 2004)

("[U]nder Fed.R.Civ.P. 15(a), leave to amend a pleading may only

be given when factors such as undue delay or undue prejudice to

the opposing party are absent." (emphasis in original)).

However, "'mere delay' is not, of itself, sufficient to justify

denial of a Rule 15(a) motion." Parker v. Columbia Pictures

Indus., 204 F.3d 326, 339 (2d Cir. 2000) (citation omitted); see

also Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008).


Proposed pleadings are futile when they would not be

able to withstand a dispositive pretrial motion. See Kemin

Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V., 464

F.3d 1339, 1354-55 (Fed. Cir. 2006) ("When a party faces the

possibility of being denied leave to amend on the ground of

futility, that party must demonstrate that its pleading states a

claim on which relief could be granted, and it must proffer

sufficient facts supporting the amended pleading that the claim

could survive a dispositive pretrial motion."); see also Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110-11 (2d Cir. 2001).

## B. TouchTunes' Motion to Amend Is Granted

In the proposed Amended Complaint, TouchTunes alleges a claim for inequitable conduct ("IEQ") regarding Arachnid's computer jukebox patents, the '398 Patent and U.S. Patent No. 6,970,834 ("the '834 Patent"). (Proposed Am. Compl. 7-61 (Dkt. No. 202-1.).) TouchTunes also seeks to add a new claim for "infectious unenforceability" regarding of the '780 Patent, as an extension of the alleged IEQ based on the '398 and '834 Patents. (See id. 61-64.)

"To prevail on the defense of inequitable conduct, the accused infringer must prove that the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc); see also eSpeed, Inc. v. BrokerTec USA, L.L.C., 480 F.3d 1129, 1135 (Fed. Cir. 2007) ("[I]nequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material

36

information, coupled with an intent to deceive." (quoting Pharmacia Corp. v. Par Pharm., Inc., 417 F.3d 1369, 1373 (Fed. Cir. 2005)). "[T]he remedy for inequitable conduct is the 'atomic bomb' of patent law . . . . [I]nequitable conduct regarding any single claim renders the entire patent unenforceable." Therasense, 649 F.3d at 1288 (citations omitted). Further, unenforceability resulting from inequitable conduct can reach to related patents in the same technology family. Id. at 1288-89.

In its recent en banc decision in Therasense, the Federal Circuit "tighten[ed] the standards for finding both intent and materiality [in IEQ cases] in order to redirect a doctrine that has been overused to the detriment of the public." Therasense, 649 F.3d at 1290. As to materiality, Therasense held that information that has been withheld from the PTO during prosecution is material if it satisfies "but-for materiality," that is

> When an applicant fails to disclose prior art to the
> PTO, that prior art is but-for material if the PTO
> would not have allowed a claim had it been aware of
> the undisclosed prior art. Hence, in assessing the
> materiality of a withheld reference, the court must
> determine whether the PTO would have allowed the claim
> if it had been aware of the undisclosed reference.

Id. at 1291.   "Although but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct, this court recognizes an exception in cases of affirmative egregious misconduct," such as the filing of an unmistakably false affidavit.   Id. at 1292.

Inequitable conduct claims must be pled with specificity under Rule 9(b).   Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326-28 (Fed. Cir. 2009); Nycomed, 2010 WL 1257803 at *13-*14.

> [T]o plead the "circumstances" of inequitable conduct
> with the requisite "particularity" under Rule 9(b),
> the pleading must identify the specific who, what,
> when, where, and how of the material misrepresentation
> or omission committed before the PTO.   Moreover,
> although "knowledge" and "intent" may be averred
> generally, a pleading of inequitable conduct under
> Rule 9(b) must include sufficient allegations of
> underlying facts. . . . [T]he pleading [must] identify
> which claims, and which limitations in those claims,
> the withheld references are relevant to, and where in
> those references the material information is found--
> i.e., the "what" and "where" of the material
> omissions. . . .[The pleading must] identify the
> particular claim limitations, or combination of claim
> limitations, that are supposedly absent from the
> information of record. Such allegations are necessary
> to explain both "why" the withheld information is
> material and not cumulative, and "how" an examiner
> would have used this information in assessing the
> patentability of the claims.

Exergen, 575 F.3d at 1328-30 (citations omitted).

38

However, "[t]he heightened pleading requirements of Rule 9(b) do not require that [the accused infringer] definitively prove the merits of its claim. What is determinative here is that [the patentee is] given fair notice of the basis for [the accused infringer's] inequitable conduct defense." WesternGeco v. Ion Geophysical Corp., 2009 WL 3497123, at *7 (S.D. Tex. Oct. 28, 2009).

In its new claims, TouchTunes alleges that Arachnid intentionally made false statements to the PTO regarding the scope and content of karaoke prior art and concealed the relevance of prior art karaoke references, including Liu, that contradicted Arachnid's representations. Specifically, TouchTunes alleges that Arachnid misinformed the PTO that prior art karaoke machines were not capable of coin operation and did not allow for a customer to select songs without additional assistance. As alleged, during the reexamination proceedings, Arachnid submitted the declaration of Patrick Rice, co-President of Arachnid. That declaration represented that in 1992 karaoke machines in public use were much different than juke boxes, were not coin-operated, were not operated by patrons but instead by a dedicated operator, and did not store or play the kind of studio quality versions of songs played in jukeboxes. The PTO Examiner rejected claims of the '398 and '834 Patents based on prior art

39

karaoke technology, and Arachnid appealed those rejections to the PTO Board. TouchTunes asserts that before the Board Arachnid again argued that karaoke prior art was distinct from juke boxes for these reasons. As pled, TouchTunes brought information contradicting Arachnid's patentability arguments to Arachnid's attention during the pendency of the appeal, but Arachnid did not direct that information to the Board but instead to the PTO's Central Reexamination Unit, which did not have jurisdiction. TouchTunes alleges that the Board reversed the Examiner's rejections based on Arachnid's misinformation, and specifically the Rice declaration. The Board concluded that it could not say that karaoke machines were capable of coin operation or allowed a customer to select songs without additional assistance. Following this reversal, the PTO issued ex parte reexamination certificate for both the '398 and '834 Patents.

Arachnid argues that TouchTunes' motion to amend should be dismissed as futile because on reexamination, following the Board's reversal, the Patent Examiner allowed the claims after considering the karaoke references that now form the basis of TouchTunes' IEQ claims. Arachnid argues that it indeed provided the Patent Examiner with some of TouchTunes'

40

chosen quotations from those references, if to attempt to refute them. (Dkt. Nos. 205-3, 205-4, 205-5, 205-6.)

Examiners have a duty to consider all prior art references. See MPEP § 609.05(b) ("Examiners must consider all citations submitted in conformance with the rules, and their initials when placed adjacent to the considered citations on the list or in the boxes provided on a form PTO/SB/08A and 08B . . . provides a clear record of which citations have been considered by the Office.") (Dkt. No. 205-1); Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 938 (Fed. Cir. 1990); Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 874, n.8 (Fed. Cir. 1988) ("Blind reliance on [counsel's] presumed candor would render examination unnecessary, and nothing in the statute or Manual of Patent Examining Procedure would justify reliance on counsel's candor as a substitute for an examiner's duty to examine the claims."). However, this duty is somewhat more limited in the specific context of ex parte reexamination:

> Where patents, publications, and other such items of information are submitted by a party (patent owner or requester) in compliance with the requirements of the rules, the requisite degree of consideration to be given to such information will be normally limited by the degree to which the party filing the information citation has explained the content and relevance of the information. The initials of the examiner placed adjacent to the citations on the form PTO/SB/08A and

41

08B or its equivalent, without an indication to the contrary in the record, do not signify that the information has been considered by the examiner any further than to the extent noted above.

MPEP § 2256.   Here, the Examiner initialed the karaoke references, except Liu, to which TouchTunes now points. (Dkt. Nos. 205-7 & 205-8.)

        Arachnid argues that for this reason, TouchTunes cannot prove the requisite but-for materiality under Therasense. However, Therasense does not require but-for materiality in all cases and recognized an exception for cases of affirmative egregious misconduct, specifically including the filing of a false affidavit.  649 F.3d at 1292.  On the present motion, all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader.   Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). TouchTunes has pled that Arachnid submitted a false affidavit, the Rice declaration, and has specified the allegedly false statements, including that karaoke machines were not coin-operated and were not operated by patrons but instead a dedicated operator, which the PTO Board in turn expressly relied upon in reversing the Examiner.  This is sufficient to plead the "what," "where," "why," and "how" required by Exergen, 575 F.3d at 1328-30.

42

At this stage, "'[t]he issue before the Court is not whether [TouchTunes] will ultimately prevail, but whether it is entitled to offer evidence' to support its allegations of inequitable conduct." Nycomed, 2010 WL 1257803 at *18 (citation omitted).  As TouchTunes has alleged sufficient facts to nudge its claims "across the line from conceivable to plausible," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), and in the absence of any delay, bad faith, undue prejudice or other such factor, as here, "the leave sought should, as the rules require, be 'freely given.'"  Foman v. Davis, 371 U.S. at 182.

TouchTunes' motion for leave to amend is therefore granted.

### C.    Arachnid Is Not Entitled to Fees or Costs

Arachnid has additionally sought the award sanctions as to TouchTunes' motion to amend.  Award of sanction under 28 U.S.C. § 1927 is appropriate when there is "clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes" and upon "a high degree of specificity in the factual findings" of the district court.  Oliveri v. Thompson, 803 F.2d

43

1265, 1272-73 (2d Cir. 1986).   No such evidence has been presented, and Arachnid's request for fees and costs is denied.

## V.   CONCLUSION

For the reasons set forth above, the disputed claim terms are given the definitions set forth in this opinion and TouchTunes' motion to amend is granted.

It is so ordered.

New York, NY
March 1 3, 2012

ROBERT W. SWEET
U.S.D.J.

44